[Civ. Nos. 22213, 22220.   Second Dist., Div. Three.   Jan. 21, 1958.]

HERBERT V. DeMOTT, Appellant, v. AMALGAMATED MEAT CUTTERS AND BUTCHER WORKMEN OF NORTH AMERICA, etc., et al., Respondents.

[Two Cases.]

14

David S. Smith for Appellant.

Aaron Sapiro and Charles M. Arak for Respondents.

SHINN, P. J.—Herbert V. DeMott appeals from adverse judgments in two actions, tried to the court, in which he sought reinstatement as a member in good standing of a labor union, restoration to office as secretary-treasurer of a union local, damages for wrongful expulsion from membership and office, and damages for slander. The actions were brought against Amalgamated Meat Cutters and Butcher Workmen of North America and four of its agents and representatives, to wit, Earl W. Jimerson, the International President, Patrick E. Gorman, the International Secretary, Max J. Osslo, a member of the union's International Executive Board, and Harold Woodard. The actions were tried concurrently and the appeals are presented on a single set of briefs.

Plaintiff became a member of the union in 1935 and since 1937 he had been an officer of union local Number 551, whose headquarters were in Wilmington, California. On October 24, 1955, DeMott was a member in good standing of the union and was secretary-treasurer of the local, an elective and salaried position. At that time local Number 551 was involved in a jurisdictional dispute between the Butchers Union and the Retail Clerks Union. It is sufficient to say at this point that DeMott was taking an active part in the dispute. There was considerable dissention within the local and at a meeting of the executive board of the local which was held on October 20th. DeMott was rebuked by other members of the board for suggesting that the local sever its connection with the butchers union and affiliate with the retail clerks.

On October 24th, DeMott sent a letter and a telegram to Gorman, who was International Secretary of the union, informing him that as of that date local Number 551 had affiliated with local Number 563 (A.M.C. and B.W.), whose headquarters were in Huntington Park. That same day, Osslo, who was a member of the International Executive Board, received a telegram from Jimerson, the union president; the wire stated that because of actions by DeMott which had

"seriously undermined the stability of the membership." Jimerson was placing local Number 551 in receivership and appointing Osslo as receiver. October 25th, Jimerson informed DeMott by telegraph of Osslo's appointment. The preceding evening, Osslo had wired DeMott, informing him that pursuant to authority delegated by Jimerson and Gorman, he (Osslo) was suspending DeMott from membership in the local. DeMott was instructed to hand over to Woodard, Osslo's deputy receiver, all the books, records, property and other assets of the local, including a Chrysler automobile, gasoline credit cards, keys to safety deposit boxes and $1,000 in cash "which you took last Friday morning October 21st." October 25th, Woodard went to the headquarters of the local and took possession from DeMott of the items mentioned in Osslo's instructions.

In appointing Osslo as receiver, Jimerson purported to exercise emergency powers granted him by article II, section 3 of the constitution of the international union. That section provided, in material part, that the president "shall assume charge of the affairs of any Local Union at any time when trouble of an internal nature threatens the effectiveness of the Local. He shall personally, or by deputy, administer the Local's affairs until he is satisfied that peace and harmony prevail." It also authorized Jimerson or his deputy to suspend the power of local union officers and to remove them from office upon evidence of misconduct, provided, however, that "no officer may be removed from office unless and until any such officer is, after proper and informative formal notice, given the opportunity of a full hearing in a manner and at such time and place as may be prescribed by the International Executive Board."

November 3d, DeMott filed an action for injunctive relief and damages, in which he sought orders restoring him to membership in the union and to office in the local; he also sought from defendants substantial damages on account of their allegedly wrongful acts in suspending him from membership and office, as well as an award of punitive damages. By a second cause of action, DeMott sought to recover damages for slander. November 4th, DeMott filed a petition for writ of mandamus, likewise seeking reinstatement to membership and office. He concedes in his brief that except for the cause of action for slander set forth in the action for injunctive relief, the two lawsuits are substantially similar.

On November 16th, after the present actions had been insti-

tuted, two sets of formal charges were brought against DeMott by members of the local. In the first set of charges, which was addressed to the local, it was alleged that for more than 10 days prior to October 25, 1955, DeMott was engaged in malicious efforts to cause disruption and discontent in the local and was attempting to cause the officers and members of the local to affiliate with the retail clerks, in contravention of article III, section 12 of the constitution of Local Number 551; the penalty provided by that section is a fine or expulsion or both. In the second set of charges, which was addressed to the local and also to the president and the executive board of the international, it was alleged that DeMott had committed serious misconduct while in office, to wit: On October 14, 1955 he caused a membership book to be issued to Charles Brenner without prior approval by the members of the local; he improperly paid $100 to Brenner for alleged "organizational activities"; he instructed Brenner on October 20th to tell Woodard to leave town; he persuaded the executive board of the local to allot him $1,000 on October 20th for alleged "organizational expenses," whereas DeMott intended to use the money to hire strong-arm men to overawe the executive board in furtherance of his disruptive policies; on October 21st he removed books and records belonging to the local from the local headquarters and did not return them until October 24th, after being warned of his misconduct. DeMott's accusers requested that the charges be presented to the membership at the next meeting of the local and that Jimerson be asked to order DeMott's salary withheld.

The combined charges against DeMott were presented at a general meeting of the local held on December 6th, at which time a trial committee consisting of seven members was elected by secret ballot. Trial was set for December 19th at the local headquarters in Wilmington. Pursuant to a resolution of the members present, a copy of the charges was mailed to DeMott; he was also informed that he had the right to present evidence on his behalf and to be represented by counsel at the trial. DeMott attended the trial in the company of his attorney, Mr. Smith. After the chairman of the trial committee read the charges, Smith stated that he was appearing specially in order to challenge the membership of the committee; the challenge was rejected. Various witnesses were sworn and gave testimony against DeMott, but Smith declined to cross-examine them, reiterating his statement that he was making a special appearance. DeMott and his attorney then

left, whereupon the committee prepared its recommendations and report. DeMott was found guilty of issuing a membership book to Brenner without prior approval of the members of the local and of attempting to cause disruption of the local by attempts to turn the local over to the Retail Clerks Union. The committee recommended that he be fined $5,000 and expelled from the local.

The report and recommendations of the trial committee, together with extracts from the testimony at the trial, were read at a general meeting of the local on January 3, 1956. The members present voted 103 to 22 by secret ballot to accept the committee's recommendations.

January 9th, DeMott was advised by letter of the action of the membership and informed that no steps would be taken with respect to the fine until he had a reasonable opportunity to appeal to the international executive board. Two days later, DeMott sent to the international executive board in Chicago, his notice of appeal from the trial committee's recommendations and the vote of the membership. February 2d, DeMott also filed his notice of appeal from the "removal, suspension, expulsion and ouster" which occurred on October 25, 1955. By telegrams dated March 2d, 21st and 22d, Jimerson informed DeMott that the hearing upon both appeals would be held June 6, 1956 at a regular meeting of the international executive board in Cincinnati; that DeMott would be afforded a full opportunity to appear and participate in the hearing in person and with counsel, and that neither Gorman, Jimerson nor Osslo would sit on the board or participate in its decision. The record does not disclose whether the hearing was actually held, for the reason that the present actions were tried during March, April and May, 1956.

We now turn to a consideration of the pleadings. The action for injunctive relief and damages was tried on DeMott's first amended complaint and the answer thereto. In his first amended complaint, DeMott alleged that he was suspended, removed and expelled from his office and from membership in the local by defendants on October 25, 1955; that he was not guilty of any infringement of the constitution or by-laws of the union; that no written charges were brought against him; that no hearing was held upon the charges; that the acts of suspension, removal and expulsion without a hearing and without the filing of written charges were in contravention of the union constitution; that he had no appellate remedy within the union for the reason that the union consti-

tution does not provide for an appeal from the act of the president, and that he has suffered irreparable harm in that he has been deprived of his right to employment by virtue of the suspension from membership. It was also alleged that defendants acted oppressively and with malice towards plaintiff, for the purpose of depriving him of his rights under the union constitution. In the second cause of action, DeMott alleged on information and belief that defendants had orally uttered and published false and defamatory statements about him. The alleged slanderous statements will be stated later in our opinion. In their answer, defendants alleged that the acts occurring October 25, 1955 were authorized under article II, section 3 of the union constitution. They set forth in detail the proceedings subsequent to October 25th to which we have already referred and alleged that the trial procedure was in full accord with the provisions of the union and local constitutions. With respect to the cause of action for slander, defendants denied each and every allegation therein contained.

The mandamus proceeding was tried on DeMott's third amended petition and the answer thereto. Additional material allegations of the third amended petition were that the local's affairs had been under the control of the international union since October 25th; that DeMott's trial was therefore not a trial by the local, but was, rather, an act of the International; that an appeal to the international executive board from the vote of the membership would be futile for the reason that three of the 21 members of the board are defendants Jimerson, Gorman and Osslo; that said defendants would exercise improper influence over the remaining members of the board. In their answer, defendants repeated the substance of the allegations of their answer in the action for injunctive relief and damages, alleged the taking of appeals by DeMott, the communications to DeMott of March 2d, 21st and 22d, and the pendency of both appeals before the international executive board.

The evidence at the trial consisted of the letters, documents and telegrams to which we have already referred, together with the testimony of DeMott, Woodard and Osslo.

DeMott testified that he disagreed with the policy of the union's international officers with respect to management of the members' health and welfare fund. He discussed the subject with Woodard on many occasions prior to October 25th. Woodard told him that unless he consented to the

imposition of a receivership over the local, he would be removed from office and expelled from the union by Jimerson. Woodard said that he would communicate false statements about DeMott to Osslo and Osslo would repeat them to Jimerson; Woodard would tell Osslo that DeMott was mishandling union funds and using his office for his personal advantage. Jimerson would then act and DeMott would have no remedy by way of an appeal. DeMott denied any misconduct while in office. He stated that a Chrysler automobile, together with gasoline credit cards, was furnished for his use by the membership. He did not remove any records from local headquarters. He had been voted $1,000 by the local executive board at the October 20th meeting to which we have already made reference; the $1,000 was in the safe at headquarters when Woodard took over the premises. Two sets of minutes of the October 20th meeting, each bearing the signature of the recording secretary, were in evidence. DeMott identified a set of minutes, which were in longhand, as a true record of what occurred at the meeting; the board voted unanimously that "suffience [sic] money's be set aside for organization purposes starting with One Thousand ($1,000.00) Dollars." According to the other set of minutes, which were typewritten, DeMott informed the board that he needed the $1,000 for "body protection." He testified that shortly before October 20th he had been shadowed by men whom he suspected to be members of the Sailors Union hired by Osslo for that purpose. Subsequent to his removal and suspension, he had been unable to obtain employment as a butcher.

Woodard did not recall telling Osslo that DeMott had taken the $1,000 for his own use. However, Osslo admitted being told by Woodard prior to October 25th that DeMott had removed records from local headquarters and was using the automobile and credit cards. A Mr. Sapiro, counsel for the local, told Osslo that DeMott had taken the $1,000. Osslo telephoned Gorman and informed him of what he had learned from Woodard and Sapiro. Upon receiving this information, Gorman presumably relayed it to Jimerson who appointed Osslo as receiver of the local.

At the close of plaintiff's evidence, defendants made motions for a nonsuit in the action for injunctive relief and to dismiss the petition for writ of mandamus. Both motions were granted. In granting the motions, the court ruled that DeMott had failed to exhaust his remedies within the union prior to the commencement of the actions, in that the evidence

introduced by him affirmatively showed that he had invoked relief by appeals within the union, that the appeals were still pending before the union and undecided, and that plaintiff had not produced evidence to justify his claim that it would be futile to invoke such appellate relief. The court also ruled that the evidence introduced by him, even if true, did not justify an action for slander against defendants. DeMott appeals from the ensuing judgment of nonsuit and order of dismissal and noticed appeals from orders denying him a new trial in each proceeding.

The first contention to be considered is that the court erred in determining that DeMott had failed to exhaust his internal remedies within the union before commencing the present actions and had failed to establish the futility of the two appeals which were pending before the international executive board at the time of trial. If the court's determination was correct, it is decisive against all the relief sought by DeMott with the exception of damages for slander.

■  It is the general rule that a person seeking judicial relief against an organization of which he is a member must first invoke and exhaust the remedies provided by that organization applicable to his grievance.  ■  It is only when an organization violates its rules for appellate review or there is an affirmative showing that it would be futile to invoke them that further pursuit of internal relief is excused. The organization's violation of its own rules which inflicts the initial wrong affords no right for direct resort to the courts. (*Holderby* v. *International Union etc. Engineers,* 45 Cal.2d 843 [291 P.2d 463] ; *Gonzales* v. *International Assn. of Machinists,* 142 Cal.App.2d 207 [298 P.2d 92].)

■  The actions sought to be reviewed and annulled were (1) the appointment of a receiver by Jimerson, (2) Osslo's purported suspension of DeMott from membership in the local and the international and, (3), the action of the local in expelling him from membership and imposing a fine.

It cannot be doubted that conditions existed which justified the action of Jimerson in taking over control of the local by means of a receivership. Regardless of the merits of the controversies between the contending factions in the local with respect to affiliation with another local, the disputes were acute, and called for intervention on the part of the international. DeMott repeatedly refers to the action of Jimerson as an "ouster" from office and membership. The appointment of a receiver suspended the powers of officers of the local

but it did not remove them from office nor from membership in either the local or the international. The local submitted to the receivership. Had no further action been taken DeMott would have continued in office with his powers temporarily suspended and his membership would have been unaffected. It is immaterial whether a member of the local would have had a right to question within the union the appointment of a receiver by appeal or otherwise. Upon the trial of the present actions no facts were developed which would have justified the court in holding that the powers of the officers of the local were improperly suspended.

The action of Osslo which purported to suspend DeMott from membership in the local and the international without a hearing of any sort was arbitrary and not authorized by Jimerson as president of the international. The purported suspension was not recognized by the local. DeMott was advised in writing by the local that he was privileged to attend meetings as a member. Moreover, the local proceeded to entertain charges against him which affected his status as a member and officer of the union. But if the purported suspension from membership, as ordered by Osslo, had the effect of removing DeMott from office, it was ineffectual unless approved by the international executive board after notice and a hearing. Osslo's action, which DeMott refers to as an "ouster," not having been approved by the board, was not a removal of DeMott from office. The effect of the so-called order was subject to review within the international union. DeMott recognized this fact in taking an appeal from the actions of Jimerson and Osslo. We have already quoted that portion of article II, section 3 of the constitution which states that removal of a local officer if ordered under the president's emergency power does not become final until the matter has been reviewed by the international executive board.

This brings us to the matter of the trial within the local which resulted in DeMott's expulsion. Article IV, section 2 of the constitution states that a local officer who has been impeached, removed or dismissed by vote of the membership may appeal to the international board; such appeal may be heard either on the basis of the record of proceedings before the local trial committee or as a trial de novo. The same appellate procedure applies to expulsions by the local. It is undisputed that plaintiff noticed appeals from the actions of Jimerson and Osslo and also from his expulsion by the local.

DeMott earnestly argues, however, that he was excused

from compliance with the general rule for the reason that the two appeals provided but a vain and illusory remedy. He does not contend that the appellate process within the union was so long and burdensome as to be illusory, as was held to be the case in *DeMonbrun* v. *Sheet Metal Workers etc. Assn.*, 140 Cal.App.2d 546 [295 P.2d 881]. His argument is that he could not obtain a fair hearing before the board. The argument cannot be maintained.

The international executive board was composed of 21 members. It is true that DeMott testified as to conversations with Woodard in which Woodard told him that he would be removed from office and expelled from the local without recourse. DeMott could also reasonably have expected that neither Jimerson, Gorman nor Osslo would be able to review his case impartially. But Jimerson informed him that they would not participate in the hearing and there was no evidence from which it could be inferred that his statement was untrue. There was also no evidence that any of the other 18 members of the board were either hostile towards DeMott, were under the influence of Jimerson, Gorman or Osslo, or that they would not afford him a fair hearing. The court properly ruled that plaintiff wholly failed to prove circumstances sufficient to excuse him from compliance with the general rule requiring the exhaustion of remedies within the union.

The next contention to be considered on the appeals is that the court erred in excluding from evidence a purported settlement agreement which, it is urged, was fully executed by the parties.

The trial commenced on March 28, 1956. After several days of testimony, the matter was continued until April 17th and then until May 15th upon representations by counsel that they were attempting to reach a settlement. DeMott's attorney prepared a typewritten agreement, dated April 2d. It is sufficient to say of the agreement that, if properly executed, it would have constituted a complete and final settlement of the litigation in a manner favorable to DeMott. The document referred to DeMott as first party and to defendants as second party. At the right side of the foot of the agreement space was provided for the signatures of DeMott and of second party "By AARON SAPIRO, Their Attorney." To the left, appeared the words: "AMALGAMATED MEAT CUTTERS AND BUTCHER WORKMEN OF NORTH AMERICA BY_____PRESIDENT BY_____SECRETARY." Below the word "SECRETARY" were the words "SECOND PARTY."

After DeMott signed the agreement, his attorney forwarded it to Sapiro together with a covering letter. The letter stated, in material part: "Enclosed herewith please find an original and eight copies of Agreement between Herbert V. DeMott, the International Union and others, the rough draft of which was approved by you yesterday.

"Would you kindly sign in the place indicated for the signature of the attorney, have your clients sign in the places indicated for their respective signatures and thereafter return all but three copies to me. When I receive the copies, I will return to you your fourth copy which I am requesting through this media that you sign today so that I may have something in my file until the document is fully signed.

"In accordance with our discussion, would you please have the fully signed copies returned to me prior to April 17, in that the 17th is the return date ordered by Judge Kincaid."

Attorney Sapiro signed and returned one copy of the agreement, as requested by counsel for DeMott. In his forwarding letter, he wrote that "Your letter correctly states our understanding."

When trial resumed on May 15th, plaintiff offered the agreement in evidence. It did not bear the signatures of Jimerson and Gorman. Defendants thereupon objected to its admission in evidence on the ground that it had not been fully executed by the parties. The objection was sustained. DeMott's counsel next offered to prove that the written agreement was intended to be merely a memorial of an oral settlement, which had been agreed upon April 2d by himself and a Mr. Block, a member of the international executive board. The court rejected his offer of proof. Defendants then offered in evidence an unexecuted counteroffer in writing, dated May 3d, apparently in order to show that negotiations for a settlement continued throughout the months of April and early May. The document differed in material particulars from the agreement presented by DeMott, and upon plaintiff's objection it was likewise excluded from evidence.

An examination of the letters exchanged by counsel affords a complete answer to plaintiff's arguments. It affirmatively appears from the letters of counsel that the parties were negotiating with a view towards a written settlement, that they did not intend the April 2d agreement to be binding until it was signed by Jimerson and Gorman, and that DeMott's attorney requested Sapiro's signature only "so that I may have something in my file until the document is fully

signed.'' ▆ When an agreement is signed and handed over with the understanding that it will not be used or become operative until it is signed by another who is expected to join therein, it does not become a contract until the additional signature has been obtained. (*Helperin* v. *Guzzardi*, 108 Cal. App.2d 125, 128 [238 P.2d 141], and cases cited.) We conclude that no error was committed in excluding the agreement from evidence and in rejecting the offer of proof.

▆ The second cause of action in the action for injunctive relief alleged that defendants had orally uttered and published false and defamatory statements which included ''that plaintiff has misappropriated funds and assets of said Local; that plaintiff had mishandled and lost funds and assets of said Local; that plaintiff has not been exercising diligence for the improvement of working conditions of the members of said Local; that plaintiff has been guilty of misconduct in office; that plaintiff has used said Local to improperly enhance plaintiff's own financial condition.'' It was alleged that the statements were made maliciously and for the purpose of injuring plaintiff in his office and business and to deprive him of an opportunity to earn a livelihood as a butcher. Defendants demurred to the second cause of action upon the ground, among others, that it was uncertain in that it could not be ascertained therefrom what defamatory words were allegedly spoken or when or where or to whom they were spoken. The demurrer was overruled. No point is made on the appeal that the complaint charged slander in such general terms as to render it extremely difficult for the defendants to prepare any defense.

The proof as to the alleged statements was vague. There was no evidence that any of the defendants stated that plaintiff had mishandled, lost or misappropriated funds of the union or had used his position to enhance his own financial position. The most that could be inferred from the testimony respecting the statements of Woodard and Osslo was that Woodard told Osslo that plaintiff was removing or had removed papers, records and credit cards from the office of the union and that Osslo told Gorman that he had been informed of that fact. Osslo also was told by Sapiro, attorney for the union, about the check for $1,000 that had been issued to and cashed by plaintiff, and Osslo relayed this information to Gorman.

There was no evidence as to the words used by Osslo in his communication to Gorman. Presumably he merely stated

what he had been told, without characterizing plaintiff's actions as dishonest. Plaintiff had custody of the records and if he was removing them from the office he presumably had an honest purpose in doing so. The statement that the records were being removed, whether true or false, carried no implication of an evil purpose on the part of plaintiff, and did not reflect upon his honesty or good intentions. No one accused him of altering, secreting or destroying the records. With respect to the check for $1,000, so far as shown by the evidence, Osslo merely reported to Gorman what he had learned from Sapiro. Presumably Sapiro stated the facts correctly. There was no evidence that Osslo accused plaintiff of misappropriating the money. It is altogether probable that he, as well as Woodard and Sapiro, considered the transaction irregular and one that should be reported to superior officers. There was no evidence that any false statement was made by anyone concerning the issuance and cashing of the check. Even if the statements that were made resulted in the suspension of plaintiff's powers by Jimerson it would not follow that they were made maliciously. The men were officers of either the local or the international union, charged with a duty to safeguard the union's interests. Plaintiff's differences with the others were over matters of policy. There was no evidence of the existence of personal animosity toward plaintiff nor of any conflicts of opinion except as to the proper conduct of the affairs of the local. As applicable to plaintiff slander would be a false and unprivileged publication, orally uttered, which tended directly to injure him in respect to his office, profession, trade or business or one which, by natural consequence, caused actual damage. (Civ. Code, § 46.) The communications which passed between Woodard and Osslo and between Osslo and Gorman were privileged. Section 47, Civil Code, provides in part that a privileged communication is one made ". . . without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent. . . ." Although the statements would not have been privileged if made maliciously, the evidence would not have justified a finding of malice.

In an authoritative article *"Proof In Libel Actions In California"* Mr. John M. Hall, of the Los Angeles Bar, wrote as follows: "The 'absence of malice is the absence of enmity.' " "This definition must be further qualified by pointing out that there may be a certain kind of ill will toward plaintiff

which will not amount to malice. For example, suppose that Smith occupies the office of county treasurer and defendant obtains from reliable sources apparently authentic information that Smith during his term of office had misappropriated public funds. In publishing this information, defendant, being a good citizen, cannot fail to be imbued with a certain feeling of ill will toward Smith. He believes that what he has learned is true; that Smith has been a faithless public officer; and he entertains toward Smith that resentment and feeling of hostility which should prompt every public spirited citizen to seek Smith's removal from office and punishment. In a sense it is true that defendant entertains toward Smith a feeling of ill will and a desire to injure Smith, yet this is not malice or evidence of malice. (Citations.) Thus the ill will which is to identified with malice must be redefined as an ill will going beyond that which the occasion apparently justifies, or as defined by one discriminating judge, 'some motive actuating the defendant different from that which *prima facie* rendered the communication privileged, and being a motive contrary to good morals.' '' (Citation.) (So.Cal. L.Rev., vol. XXIV, No. 4, p. 350.)

█ Statements made without malice wholly within the ranks of a labor union during a dispute between contending factions over union policies and administration, and pertinent thereto, should be regarded as privileged. (*Emde* v. *San Joaquin County etc. Council,* 23 Cal.2d 146 [143 P.2d 20, 150 A.L.R. 916] ; *Campbell* v. *Jewish Committee for Personal Service,* 125 Cal.App.2d 771 [271 P.2d 185].) █ In the present case the statements that were proved were clearly within the realm of privilege. Although privilege was not pleaded by the defendants it affirmatively appeared from the pleadings that the communications, if slanderous at all, were between parties interested in the subject discussed. (Civ. Code, § 47 ; *Locke* v. *Mitchell,* 7 Cal.2d 599 [61 P.2d 922].)

The trial court correctly concluded as a matter of law that the statements of the defendants were privileged. (See Hall, So.Cal.L.Rev., *supra,* vol. XXIV, No. 4, pp. 373, 374.)

The orders denying motions for new trial not being appealable, the notices of appeal from those orders are void and of no effect. The judgments are affirmed.

Wood (Parker), J., and Vallée, J., concurred.

A petition for a rehearing was denied February 17, 1958, and appellant's petition for a hearing by the Supreme Court was denied March 19, 1958.