[Civ. No. 21698. Second Dist., Div. One. Aug. 12, 1958.]

MICHAEL D. JEFFERS, Appellant, v. SCREEN EXTRAS GUILD, INC. (a Corporation) et al., Respondents.

Perry Bertram for Appellant.

Gilbert, Nissen & Irvin for Respondents.

LILLIE, J.—The libel action now under consideration was commenced on May 18, 1950, and has now been the subject of three trials and four appeals. (See *Jeffers* v. *Screen Extras Guild, Inc.* (1951), 107 Cal.App.2d 253 [237 P.2d 51]; (1955), 134 Cal.App.2d 622 [286 P.2d 30]; and (1956), 140 Cal.App. 2d 604 [295 P.2d 417].) Plaintiff now appeals from a judgment on the merits in favor of the defendants.

On August 9, 1950, a general demurrer was sustained to the amended complaint which had failed to allege any special damages. On plaintiff's appeal from the resulting order dismissing the action, the appellate court determined that "the words appearing in the complaint" were libelous under the definition of section 45 of the Civil Code and directed the trial court to overrule the demurrer. (*Jeffers* v. *Screen Extras Guild, Inc.*, 107 Cal.App.2d 253 [237 P.2d 51].) Thereafter, an answer was filed in which the guild, its officers and directors, admitted that the news letter in question had been sent in envelopes to guild members exclusively, but denied that plaintiff had been libeled or damaged. Both truth and privilege were pleaded. They alleged that the letter had been published by way of reply to plaintiff's own charges and political attacks against the guild and its board of directors, whereby he gave consent to the countercharges made by the defendants.

The first jury trial of this action lasted from April 2, 1953, to November, 1953, at which time a judgment of nonsuit was granted in favor of all members of the guild's board of directors except the officers; and the cause was dismissed as against the guild's legal counsel. The trial then continued until February 16, 1954, when the jury was discharged for inability to agree.

A second jury trial before a different judge began on July 19, 1954, and on August 18, 1954, a nonsuit was granted in favor of the guild's five officers. The action then proceeded against the guild, its executive secretary, H. O'Neil Shanks, and its public relations counsel, Buck Harris, who are the respondents herein. On September 4, 1954, the jury returned a 9 to 3 verdict for plaintiff in the amount of $10,000 general

damages and punitive damages of $23,750 against defendant guild, $1,000 against defendant Harris, and $250 against defendant Shanks. On November 3, 1954, this verdict was set aside and a new trial ordered "upon the grounds of excessive damages and insufficiency of the evidence to justify the verdict."

The third trial, resulting in the judgment here appealed from, began before a jury on May 12, 1955. During the trial and on June 13, 1955, after the trial judge had investigated the matter, one of the jurors was "discharged for misconduct" and by stipulation replaced with an alternate. Thereafter, upon agreement of counsel, the trial was continued and finally completed before the court sitting without a jury, resulting in a judgment for the defendants. A motion for a new trial was denied and this appeal was taken by the plaintiff.

Before setting forth the essential details of the controversy, we quote in full the alleged libelous publication which was circulated among members of the Screen Extras Guild:

"News Letter to Members.

Vol. IV No. IV April 5, 1950

Jeffers Leads Recall Scheme, Attempts to Destroy SEG;
Jeffers is SPU and CSU;
Extras Don't Want Jeffers nor SPU nor CSU.

"Mike Jeffers, demagogue and would-be dictator, was forced out into the open last week as the leader of the small clique that seeks to destroy Screen Extras Guild. Jeffers personally solicited signatures on an anti-Guild Petition and he personally handed out an unsigned, mimeographed, lying attack on the officers and directors of the Guild. The Screen Extras Guild accepts Jeffers' challenge and will continue to expose him for what he is—a would-be dictator who seeks to further his own selfish ambitions at the expense of the extra players; a discredited leader of a discredited union which permitted open shop for extra players and started to flood the extras' ranks with non-union newcomers. That is Jeffers.

"Jeffers yells his head off each time one of his underhanded schemes is exposed as a plot by leaders of the defunct SPU to destroy our American Federation of Labor Guild of extra players. Of course he doesn't like it. He would prefer that the extras would forget all about the terrible things he did to extras. Jeffers would like the extra players to forget that

he was part of the Commie-influenced Conference of Studio Unions which pulled two disastrous jurisdictional strikes in 1945 and 1946. Jeffers would like you to forget that he never did one thing for the good of the extra players, that all he did was to bring about open shop. But the extra players are not going to forget it—now or ever.

"Jeffers squirms when it's shown that he is responsible for the present situation in which a number of extra players have been forced by the producers to accept $9.45 calls or do without unemployment insurance. He cannot refute the charge for the Court records prove it and therefore he engages in a lot of double-talk about something that was said at a membership meeting several years ago. The Guild will not allow Jeffers to dodge the issue. Here are the facts, which are a matter of Court record and can be checked by any extra player: The California Appellate Court decision which says that extras must be willing to accept $9.45 calls in order to be eligible for unemployment insurance was made in the case of Loew's, Inc. versus California Employment Stabilization Commission. This case was filed in Court on December 26, 1945. On that date, Jeffers' SPU was the bargaining agent for extra players. The producers did not dare take the case into Court while the extras were still in Screen Actors Guild, for the weight of the entire A. F. of L. would have been brought to bear to insure that no extra player would be denied his unemployment insurance rights. The producers waited until Jeffers brought about open shop for extra players and then they took the case to Court, with the result that all extra players are now affected by a Court decision for which Jeffers is mainly responsible. Once an adverse Court decision was entered, it becomes a thousand times more difficult for Screen Extras Guild to correct the harm done, even with full A. F. of L. support. These are the facts and all of Jeffers' ranting and raving won't alter them.

"Jeffers tries to make something out of the fact that the present mob scene rate is $9.45. In the SPU open shop days, it was $5.50. In the SPU open shop days, the rate for general extra work was $10.50. Today, it is $15.56. In the SPU open shop days, the rate for dress extra work was $16.50. Today, it is $22.23.

"Screen Extras Guild is firmly committed to the principle of completely abolishing the $9.45 rate for legitimate extra players. In our present negotiations with the producers, we have made some progress in that direction—a great deal more

progress than Jeffers ever could make. For some years, every time we reach a crucial point in our negotiations with the employers, Jeffers starts a new attempt to split the Guild. This makes it just that much more difficult to get a half-way decent deal. Jeffers' underhanded tactics are hurting all the extra players. But despite Jeffers, we are making progress.

"Jeffers has sunk to a new low in his scheme to destroy the Screen Extras Guild. He now has as his ally the slimiest, dirtiest, most despised scandal sheet in the entire history of Hollywood. 'Birds of a feather flock together' and this disreputable, lying, blackguard, yellow rag is now supporting Jeffers in his attempt to split and destroy the Guild. The Screen Extras Guild, its officers and directors are proud to be on the 'blacklist' of this filthy publication. The Screen Extras Guild refuses to be blackjacked into paying tribute under any guise whatsoever to any publication. Jeffers is welcome to his latest rotten associate. SEG dares them to sue us for libel.

"Every union and guild in Hollywood is faced with the greatest unemployment in the history of the studios. All are doing their utmost to improve the situation, working through the American Federation of Labor. What does Jeffers think he could do? Call a strike? Officers and directors of Screen Extras Guild are getting far less work now than before they were elected by the SEG members. Does Jeffers think that he could improve the unemployment situation by taking the extra players out of the American Federation of Labor and bringing back open shop?

"The Screen Extras Guild is working all the time for the good of all legitimate extra players. The Guild is not perfect, for it is made up of humans—extra players—and perfection is not a human trait. But the Guild is so far superior to anything that Jeffers and his cohorts have to offer that the extra players once again by overwhelming majority will repudiate Jeffers and his latest scheme. The legitimate extra players will continue working together within Screen Extras Guild, the American Federation of Labor organization of the legitimate extra players."

The trial was an extended one and resulted in a reporter's transcript of some 4,000 pages. There were numerous items of documentary evidence. All parties engaged in a plenary investigation of various matters related directly or indirectly to the controversy. From this voluminous record, sometimes obscured by more or less extraneous matters, the following facts appear to be germane to the present appeal.

Appellant Jeffers since 1950 has been an "extra player" in the motion picture industry, and is now a suspended member of the respondent guild, which is a nonprofit corporation representing and bargaining collectively for all persons employed as "extra players." The "News Letter to Members," in which the alleged libel was published, is "an informational bulletin or paper for the purpose of disseminating facts and news deemed to be of special interest to the membership of defendant Guild." Buck Harris, defendant, in pursuit of his duties as the guild's public relations counsel, was the author of the article in question and the distribution of the news letter was under the supervision of executive secretary, defendant H. O'Neil Shanks.

The events leading up to the publication in question have their genesis in the period immediately prior to 1944 when the extra players had no labor organization, but were "junior" or "B" members of the Screen Actors Guild, Inc. Appellant Jeffers participated in activities of a so-called Screen Players Protective Committee, organized to secure more satisfactory representation for the extra players, and later became business agent for the Screen Players Union, which in December, 1944, was certified as the collective bargaining representative for the extra players. Jeffers served actively in that capacity from early 1945 through March, 1946. He testified that he continued to act as "unofficial business agent" of the Screen Players Union after this organization had been replaced by the Screen Extras Guild as collective bargaining representative.

On March 12, 1945, a jurisdictional strike of motion picture employees occurred, involving claim of the International Alliance of Theatrical and Stage Employees that it was entitled to do certain work previously done only by Set Decorators Local 1421. The right of set decorators to do this work had been confirmed by the War Labor Board. The set decorators, together with other unions affiliated with the Conference of Studio Unions, elected to strike, and the same evening Jeffers' Screen Players Union voted to support the strike. In October of 1945 mass picketing at Warner Bros. Studio in Burbank erupted with such violence that October 8, 1945, became known as "Bloody Monday." A few days thereafter the strike was ended. As business representative of the Screen Players Union, appellant Jeffers attended strike strategy committee meetings and, as an observer, was present at or near picket lines.

A definite animosity between appellant and the Screen Extras Guild seems to date from about this period. Both before and after the strike there were futile efforts to work out an amalgamation between the two unions. The Screen Extras Guild, in March, 1946, became the certified collective bargaining representative. Then the Screen Extras Guild opposed appellant's candidacy for state assemblyman. From that time on there appears to have been an interchange of charges and countercharges which ultimately culminated in the alleged libelous publication.

There were, for example, letters from appellant Jeffers and one Don Wayson proposing that the guild make 50 per cent of its cash surplus available to aid needy and destitute members and requesting a reduction of dues, an economy regime, and other reforms. The guild did not reply to these letters, but finally on March 15, 1948, sent Jeffers a letter demanding that he refrain from filing ''further sham or frivolous charges'' against members of the guild and to disaffiliate from certain committees. Another inflammatory item was the failure of appellant to pay his dues on time; the guild refused to reinstate him except upon payment of a fine of $100, and Jeffers declined to make the extra payment. There was also a movement to recall officers and directors of the guild in which appellant circulated petitions and handed out a circular referred to by the respondents as a ''smear sheet.'' This was followed by the guild's news letter, dated April 5, 1950, on which the present action is based. These activities by no means encompass the entire controversy; they are merely pertinent exemplars of what went on during a hectic period.

The trial court found that the defamatory statements complained of were and are true in substance and fact; that the defendants had probable cause and reasonable grounds for believing in their truth, and did believe that each and all of said statements were true in substance and in fact; that such statements were published in the news letter ''in good faith for the information and benefit of the members of defendant Guild, without malice, and for the sole purpose of protecting the interests of the membership of the defendant Guild.''

Along this same line the court found that during the critical period in which the news letter was published, the guild was engaged in important bargaining negotiations with the motion picture producers and in conducting an annual election of officers, and that ''the hostile actions taken at that particular

time against the defendant Guild by the plaintiff embarrassed, interfered with, and damaged the defendant Guild in connection with its normal operation.'' It was found that during the same period plaintiff published and distributed to numerous members of the guild a handbill and caused to be published and distributed to numerous members of the guild and the general public a number of newspaper articles, the contents of which included provocative attacks, hostile criticism, and inflammatory and derogatory statements of and concerning the defendant guild, and all of its officers and directors, which attacks, criticisms, and statements were false and untrue.

The trial court found that plaintiff engaged in these and numerous other hostile activities throughout several years just previous to April of 1950 in an effort to fulfill his desires to become the union leader of the motion picture extra players, to acquire power and influence over the affairs of the motion picture extra players and to destroy or at least render impotent the defendant guild. The court further found that Jeffers had engaged in this conduct ''with full knowledge that his actions would provoke an answer and reply thereto by the defendants'' and that the news letter article had been provoked by plaintiff's hostile conduct, and published by the guild ''in self-vindication and by way of reply,'' in good faith and without malice. The guild's reply ''did not go beyond the reasonable requirements of the occasion; that there was no excessive publication under the circumstances,'' and any ill will or hostility therein expressed ''consisted only of honest indignation.'' The trial court found that plaintiff had not been damaged in any sum.

Plaintiff's appeal is predicated upon the following points: (1) the court erroneously interpreted the news letter as not being defamatory of plaintiff on the subject of Communism and on the subject of his having the same evil character and engaging in the same wrongful and illegal activities as Tarantino and his Hollywood Life Magazine; (2) the court erroneously admitted irrelevant and prejudicial evidence, erroneously excluded relevant and admissible evidence, and prejudicially restricted appellant's redirect examination and the cross-examination of respondents and their witnesses; and (3) the court's findings on the issues of truth and malice are not supported by any substantial evidence.

Although this appeal might be adequately disposed of by observing that appellant's various contentions are not sustained by the record, that substantial evidence is disclosed in

support of the findings, and that no reversible error is apparent, a more detailed survey will be made.

Apropos the contention that the trial court erred in its interpretation of the news letter publication, appellant's brief lays considerable stress on the fact that in one of his previous appeals, *Jeffers* v. *Screen Extras Guild, Inc.,* 107 Cal.App.2d 253 [237 P.2d 51], this court held that the words charged in the complaint are to be deemed libelous and that the trial court erred in holding otherwise. The previous appeal, however, was concerned only with the question whether the complaint stated a cause of action. It did not involve the merits of the case nor purport to determine whether, under circumstances shown by the evidence, the charge was actionable. However, the trial court in the instant case did follow that decision and held that the publication did contain defamatory matter, but found that the same was substantially true, and that it was also privileged in the absence of malice. The previous appeal, then, adds nothing in support of appellant's position.

In this connection it is to be noted that the trial court was not dealing solely with the problem whether appellant had been wrongly accused of Communistic activities. Although much prominence was given this phase of the controversy, appellant's complaint is manifestly predicated upon the *entire* News Letter. According to the article, plaintiff is a "demagogue and would-be dictator," who "seeks to destroy Screen Actors Guild" and he is charged with "underhanded schemes," and as having "as his ally the slimiest, dirtiest, most despised scandal sheet in the entire history of Hollywood." The sum total of all this is that appellant is charged with being a generally undesirable representative whom the screen extras should not trust. The statement that "he was part of the Commie-influenced Conference of Studio Unions," serious as it is, seems to have been a mere portion of the entire article.

The trial court did not find that the appellant was a Communist, nor is the decision based upon this isolated portion of the news letter. What the court did do was to appraise the publication as a whole and determine that in view of the surrounding circumstances, the article considered as an entirety could not be deemed libelous.

It is conceded by all parties that an alleged libelous publication must be considered as a whole and not divided

728

into segments. As stated in *Bates* v. *Campbell*, 213 Cal. 438, 441 [2 P.2d 383], the publication is to be construed "as well from the expressions used, as from the whole scope and apparent object of the writer," quoting from *Stevens* v. *Storke*, 191 Cal. 329, 334 [216 P. 371]. And, "... it is the duty of the court to give the language used the natural and popular construction of the average reader, not the critical analysis of a mind trained in technicalities." (*Sullivan* v. *Warner Bros. Theatres, Inc.*, 42 Cal.App.2d 660, 662 [109 P.2d 760].)

 The case proceeded in the trial court on the theory that this action was one sounding in libel *per se* rather than in libel *per quod*, in which latter case special damages would have had to be alleged and proved. The present review must therefore proceed on the same theory. (*Shumate* v. *Johnson Publishing Co.*, 139 Cal.App.2d 121 [293 P.2d 531].) Such being the nature of the case, it was proper for the trial court to consider the specific meaning of the article from the language used, apart from any innuendo or inducement. And whether such a publication is libelous *per se* is a question of law. (*Smith* v. *Los Angeles Bookbinders Union*, 133 Cal. App.2d 486 [284 P.2d 194].) Among the many cases stating these basic principles is that of *Emde* v. *San Joaquin County etc. Council*, 23 Cal.2d 146 [143 P.2d 20, 150 A.L.R. 916].

 Also applicable to the present situation is the statement of the reviewing court in the *Emde* case at page 160: "It is generally agreed that it is not necessary to prove the literal truth of an allegedly libelous accusation in every detail, so long as the imputation is substantially true so as to justify the 'gist' or 'sting' of the remark." These principles appear to have received proper consideration and application in the instant case.

 What has been said of appellant's charge that the News Letter tended to "pin the Commie tag on me," will apply with equal force to another isolated portion of the article known as the "Tarantino" paragraph. There was evidence that appellant had contributed certain material or articles to Tarantino's Hollywood Life Magazine, preceding publication of the respondents' News Letter which stated that Jeffers "now has as his ally the slimiest, dirtiest, most despised scandal sheet in the entire history of Hollywood," and made similar statements linking appellant with this publication.

This again was but a small, although integral, part of the entire publication. As pointed out in the respondents' brief,

the news letter speaks of the unnamed publication as "the slimiest, dirtiest, most despised *scandal sheet*"; as a "disreputable, lying, blackguard, yellow rag"; and as a "filthy *publication.*" (Emphasis added.) These epithets are not directly applied to Mr. Tarantino, its publisher, nor to Mr. Jeffers, but to the publication itself. They were terms of general abuse of a cumulative nature and even if meant to be applied to appellant, as previously mentioned, defendants are not required to justify each and every word of the alleged defamatory matter. (*Hearne* v. *De Young,* 119 Cal. 670 [52 P. 150, 499] ; *Smith* v. *Los Angeles Bookbinders Union,* 133 Cal.App. 2d 486 [284 P.2d 194].)

The trial court's conclusions that the news letter was issued on a privileged occasion and was qualifiedly privileged within the meaning of section 47, subdivision 3 of the Civil Code, "and that plaintiff, having the burden of proof, had failed to establish the existence of actual malice or any other abuse of the defendants' qualified privilege by a preponderence of the evidence," predicated upon the findings that the article was published in good faith for the information and benefit of the members of defendant Guild, without malice, and for the sole purpose of protecting the interests of the membership, are assailed by appellant on the ground that there is no substantial evidence to support the finding that respondents were not guilty of publishing the libel. More specifically, appellant claims that the violence of the language establishes actual malice, and the conduct, acts and statements of the respondents toward appellant, from 1946 on, demonstrate the existence of malice.

■ There is abundant evidence, indeed it is not controverted, that the alleged libel was published by the defendants as a part of a labor controversy. This being so, the principle enunciated in *DeMott* v. *Amalgamated Meat Cutters,* 157 Cal. App.2d 13 [320 P.2d 50], is applicable: "Statements made without malice wholly within the ranks of a labor union during a dispute between contending factions over union policies and administration, and pertinent thereto, should be regarded as privileged," citing *Emde* v. *San Joaquin County etc. Council,* 23 Cal.2d 146 [143 P.2d 20, 150 A.L.R. 916]. This sort of privilege is covered by section 47 of the Civil Code, which provides that "A privileged publication . . . is one made . . . 3. In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as

to afford a reasonable ground for supposing the motive for the communication innocent. . . ."

In respect to the element of malice which will defeat the claim of privilege in question, the court in the DeMott case just cited made this statement, at page 25, which seems applicable to the present controversy: "In an authoritative article *'Proof in Libel Actions In California'* Mr. John M. Hall, of the Los Angeles Bar, wrote as follows: '. . . Thus the ill will which is to be identified with malice must be redefined as an ill will going beyond that which the occasion apparently justifies, or as defined by one discriminating judge, "some motive actuating the defendant different from that which *prima facie* rendered the communication privileged, and being a motive contrary to good morals." ' (Citation.) (So. Cal. L. Rev., vol. XXIV, No. 4, p. 350.)"

A labor union such as the respondent Guild is, by its very nature, an association of persons in a common interest. And, as stated in *Smith* v. *Los Angeles Bookbinders Union*, 133 Cal.App.2d 486, at page 493 [284 P.2d 194], "Since labor disputes '. . . normally involve considerable differences of opinion and vehement adherence to one side or the other, a necessarily broad area of discussion without civil responsibility in damages is an indispensable concomitant of the controversy.' (*Emde* v. *San Joaquin County etc. Council*, 23 Cal.2d 146, 155, 156 [143 P.2d 20].) Moreover, when the alleged defamatory matter is susceptible of an innocent interpretation it is not actionable *per se."*

This, then, was the situation with which the trial court was confronted in the instant case. The question whether the peculiar circumstances disclosed a privileged occasion was a mixed question of law and fact to be determined by the judge hearing the case without a jury. The parties to this litigation appear to have fully litigated these questions, and there was abundant evidence bearing on the question of privilege and malice from which the court determined that a privileged occasion existed and that the defendants' privilege had not been lost or destroyed by the existence of malice. No error either as to fact or law has been satisfactorily pointed out.

Reversible error has been assigned to the admission and exclusion of evidence and alleged restriction of appellant's cross-examination and redirect examination. This is directed largely to the proposition that the trial court prejudicially permitted respondents to try the issue of "Communism in

Hollywood." It is true that the record discloses much evidence on the subject of the infiltration of Communism in Hollywood and the motion picture industry and that at times this topic received an inordinate amount of attention. But the record also reveals that the appellant, as well as the respondents, willingly entered this field and canvassed the matter quite thoroughly. This did little or nothing to assist the court or clarify the problem. On the contrary, it probably prolonged the trial unduly and tended to obscure the fundamental issues.

While it may well be that too great latitude was accorded the parties in this respect, it does not follow that any prejudice resulted therefrom, and the record refutes the idea that appellant in any manner suffered from this or any other alleged error, if any there was. In some respects, appellant may have actually benefited from the broad latitude which was permitted. Certainly no reversible error is here apparent.

The appellant claims to have been unduly restricted in offering evidence, cross-examination, etc., on the subjects of "blacklist," "blackjacking into paying tribute," Jeffers' alleged alliance with one Tarantino, publisher of a so-called scandal sheet, and other persons, and divers matters directly or indirectly connected with the controversy. No reversible error has been made manifest here or elsewhere and the record indicates that appellant was at all times given proper leeway and was not unduly restricted at any point. He was accorded ample opportunity to present his own case and to refute that of his adversaries. Appellant was entitled to no more than this.

The appellant's contention that the trial court's findings in respect to truth, privilege, and malice, etc., are not supported by the evidence is untenable. Notwithstanding his asseverations that the reviewing court is not being asked to reweigh the evidence, this in effect appears to be exactly what the appellant here seeks. It is a fundamental principle that an appellate tribunal must accept as true all evidence and inferences tending to support the findings, resolving all conflicts in favor of the trial court's determination. Where there is any substantial evidence in support of the findings, a reviewing court possesses no authority to substitute its judgment for that of the court which heard the evidence and had the opportunity of observing the demeanor of the witnesses. (*Primm* v. *Primm*, 46 Cal.2d 690 [299 P.2d 231].)

The present appeal is documented by a voluminous transcript of the evidence which presents at least the normal amount of conflict. In such a situation it is not difficult for an appellant to segregate certain evidentiary items which seemingly dispute the findings. This the appellant has done, but his references to the record by no means support his argument that the findings are ''wholly and completely incompatible'' with the evidence. On the contrary, the trial court's findings are adequately supported at all points.

It was found that the alleged defamatory article was substantially true and also that it was of a privileged nature and published without malice. Either of these matters, truth or qualified privilege, furnishes a complete defense to the action. It follows that the judgment must be affirmed if the findings on either issue are supported by any substantial evidence. As already indicated, the existence of such support cannot well be doubted.

There is, for example, credible evidence to indicate that Buck Harris, author of the news letter article, derived his information from seemingly reliable sources, and that the defendants were actuated by a sense of obligation to safeguard what they regarded as the best interests of the Guild. From Jeffers' own testimony may be gleaned various references and admissions, express and implied, tending to support the findings. Certainly there was much evidence in reference to his zealous activities in behalf of the extra players' organizations, and his unequivocal attacks launched against the Guild and its officers. Testimony of the defendants Shank and Harris, various directors of the guild, and other witnesses, likewise furnishes substantial support for the decision reached. The trial judge had a right to believe this evidence and there should be no appellate interference with the conclusions derived therefrom.

The judgment is affirmed.

White, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied September 8, 1958, and appellant's petition for a hearing by the Supreme Court was denied October 10, 1958.