**Robert A. MAHEU, Plaintiff-Appellant and Appellee,**

**v.**

**HUGHES TOOL COMPANY, a corporation, now known as Summa Corporation, Defendant-Counterclaimant-Appellant and Appellee.**

**Nos. 75–1306, 75–2353.**

United States Court of Appeals, Ninth Circuit.

Dec. 27, 1977.

As Modified Jan. 12, 1978.

---

Before DUNIWAY, CHOY and WALLACE, Circuit Judges.

DUNIWAY, Circuit Judge:

This is a diversity action for defamation brought by Robert A. Maheu against Hughes Tool Company, now named Summa Corporation ("Summa"). The defamatory statement was made by Howard Hughes, sole owner of Summa.

### I. *Preliminary Observations.*

As it comes to us, the case is unusual in several respects. First, the record is immense. The Clerk's record of court papers (other than exhibits) consists of thirty-two volumes containing 8,545 pages and two supplemental volumes containing 505 pages. There are 92 volumes of reporter's trial transcript, containing 15,472 pages. There are also 22 volumes of reporters' transcripts of various pre-trial hearings. The pages of these are not consecutively numbered, but there are several hundred. There are thousands of exhibits, and many depositions, some very long, were taken. Rule 1 of the Federal Rules of Civil Procedure, as adopted nearly 50 years ago, states the high hopes of the draftsmen: the rules "shall be construed to secure the just, speedy, and inexpensive determination of every action." Something in the Federal civil procedure has gone very much awry. Where now is speedy and inexpensive determination?

Second, Summa admitted that the defamatory statement was made by Hughes, and Summa assumed legal responsibility for it. Summa also conceded that if the jury were to find the statement false, Summa could be deemed to have acted with actual malice as defined by the Court in *New York Times v. Sullivan,* 1964, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686. The parties also stipulated that both Maheu and Hughes were public figures and that the subject matter was of public or general concern. Summa relied solely upon the defense of truth, and it assumed the burden of proving truth. *Lipman v. Brisbane Elementary School Dist.,* 1961, 55 Cal.2d 224, 11 Cal. Rptr. 97, 359 P.2d 465.

Morton R. Galane (argued), of Galane, Tingey & Shearing, Las Vegas, Nev., Laurence H. Eldredge (on the brief), San Francisco, Cal., for plaintiff-appellant and appellee.

Norbert A. Schlei and Malcolm E. Wheeler (argued), Hughes Hubbard & Reed, Los Angeles, Cal., Howard M. Jaffe, Davis & Cox, New York, N. Y., Charles Alan Wright, Austin, Texas (of counsel), on the brief, for defendant-counterclaimant-appellant and appellee.

Third, the defamatory statement was, in essence, that Maheu had "stolen" money from Hughes. Summa counterclaimed for numerous amounts of money including unpaid loans and moneys that it claimed that Maheu had wrongfully obtained. The jury returned a large verdict for Maheu, and so must have found that the defamatory statement was false, but it also awarded Summa part of the moneys that it claimed. Moreover, the court awarded Summa a judgment against Maheu for a very much larger amount. From that judgment Maheu does not appeal. Both the verdict and the court's judgment included some of the moneys wrongfully obtained.

Fourth, Hughes had become an eccentric, who had totally withdrawn from direct contact with the outside world. He would not appear in any court; he would not give depositions. Thus there is no testimony by him in the case. Maheu knew that Hughes would not testify, and he took full advantage of this, to him, happy situation. Much of the crucial testimony in the case is Maheu's recital of telephone conversations with Hughes to which no one else was a party, and of which no contemporaneous record was made.

## II. *Statement of the Case.*

### A. *The trial and judgments.*

A bifurcated trial was held. The jury returned a verdict in the liability phase in favor of Maheu and at the second phase of the trial awarded Maheu compensatory damages of over $2.8 million. Summa was awarded approximately $48,000 on its counterclaims. The trial court entered judgment for the $2.8 million plus for Maheu and for approximately $470,000 plus accrued interest for Summa. The judgment for Summa included the jury's award of $48,000 plus claims which the trial court resolved in Summa's favor without submission to the jury. Both parties appeal. We reverse in part and remand for a new trial.

### B. *The basic facts.*

On December 5, 1970, Howard Hughes discharged Robert A. Maheu, thus ending a 14-year relationship involving Maheu, Hughes and Summa. Thereupon Maheu filed suit in Nevada state court to retain his position, claiming, *inter alia*, that Hughes had been coerced into firing him or that someone other than Hughes had ordered the firing. These goings on were widely publicized. Late in 1971, a major publisher announced plans to publish an "autobiography" of Hughes purportedly based upon personal interviews with Hughes by one Clifford Irving. Questions raised by Maheu and the proposed Irving book aroused the concern of Nevada officials as to the ownership and management of Hughes very extensive Nevada interests.

To establish that Irving's book was not authentic, Hughes arranged a telephonic news conference on January 7, 1972, with Hughes speaking from Paradise Island in the Bahamas to newsmen assembled in the Sheraton Universal Hotel in Los Angeles. During that telephonic news conference, the following colloquy occurred:

Q. [by Mr. Neal of NBC] Was Maheu fired on your orders and because of—

A. (Answer not audible.)

MR. NEAL: Would you ask him to repeat that, please.

Q. Would you repeat that, please.

A. Specifically.

Q. Why?

A. Because he's a no-good, dishonest son-of-a-bitch, and he stole me blind.

Q. Thank you. Mr. Hughes, this is your first news conference in how long?

A. I don't suppose I ought to be saying that at a news conference, but I just don't know any other way to answer it. If you, if you would even—you wouldn't think it could be possible with modern methods of bookkeeping and accounting and so forth for a thing like the Maheu theft to have occurred, but believe me it did, because the money's gone and he's got it.

Those statements form the basis for this suit. Because Summa argues, *inter alia*, that the evidence either clearly established

the truth of those statements or at a minimum was inadequate to support the verdict, we will present further facts as they become relevant to our resolution of those issues.

### III. Denial of Motions for Directed Verdict and Judgment N. O. V.

#### A. The standard of review.

■ Summa challenges the trial court's denial of its motions for a directed verdict or a judgment n. o. v. As part of that argument, Summa maintains that this court should conduct a de novo review of the evidence to determine whether it establishes the defense of truth. Normally the standard for appellate review of motions for directed verdict and for judgment n. o. v., is whether, viewing the evidence in the light most favorable to the party opposing the motion, the evidence permits only one reasonable conclusion as to the proper result. 5A Moore's Federal Practice, ¶ 50.02(1) and ¶ 50.07(2) (1975). Kay v. Cessna Aircraft Co., 9 Cir., 1977, 548 F.2d 1370, 1372. Summa contends, however, that de novo review is required here to assure adequate protection of First Amendment rights.

■ Summa explains its views as to the appropriate application of its proposed standard as follows:

First, the Court must examine all the evidence. Second, the Court must draw all reasonable inferences and resolve all credibility questions in Maheu's favor. Finally, the Court must make its own determination as to whether Summa proved by a preponderance of the evidence that the gist of the defamatory utterance was true. (Reply Brief at 23)

While we have no difficulty with the first two steps, we disagree with the third.

The effect of applying Summa's de novo review standard would be to give Summa a second chance to convince an independent fact finder. In effect, we are being told to ignore the jury's factual determination and to reach our own verdict. That we refuse to do.

Guam Federation of Teachers, Local 1581, A.F.T. v. Ysrael, 9 Cir., 1974, 492 F.2d 438, cert. denied, 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111, supports our conclusion. We held there that the traditional standard for appellate review of motions for a directed verdict and judgment n. o. v. should be applied in this type of case. Ysrael was a libel action in which the issue was the propriety of the granting of a directed verdict for the defendant. We held that a de novo review of all the evidence by the trial judge or this court with an independent decision on credibility and what inferences should be drawn, was not proper. Instead, we stated:

We think that in a libel case, as in other cases, the party against whom a motion for summary judgment, a motion for a directed verdict, or a motion for a judgment notwithstanding the verdict is made is entitled to have the evidence viewed in the light most favorable to him and to all inferences that can properly be drawn in his favor by the trier of fact. We think, too, that in such cases it is not only not the duty of the judge, or of this court of appeal, to weigh the credibility of the evidence, or to draw inferences in favor of the moving party (except, of course, when no contrary inference can legitimately be drawn), but that neither the judge nor this court on appeal has the authority to weigh credibility or to choose among legitimate inferences in such cases.

The standard against which the evidence must be examined is that of New York Times and its progeny. But the manner in which the evidence is to be examined in the light of that standard is the same as in all other cases in which it is claimed that a case should not go to the jury. 492 F.2d at 441.

Thus, in Ysrael, when reviewing a finding on the issue of malice we still applied the traditional standard of review of a jury's fact finding, although a showing of actual malice is constitutionally required. If that standard is applicable to an "actual malice" determination, then it is even more clearly applicable here, when it is questionable whether the issue of truth rises to the level

of a "constitutional fact." It is at least arguable that Summa, by conceding *New York Times* type of malice if the defamatory statement were proven false, has taken any First Amendment issue out of the case.

In addition, none of the cases cited by Summa in support of its argument for *de novo* review is directly applicable to the factual determination of truth after actual malice has been admitted, which is the issue here. The cases consistently deal with an independent evaluation of the record when a constitutional standard was not properly applied in the lower courts.

In *Garrison v. Louisiana*, 1964, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125, the Court held that the *New York Times* standard of actual malice applied to criminal actions based on the criticism of the official conduct of public officials. The purpose of the Court's examination of the facts was to determine whether the evidence supported a finding of actual malice—a finding which the lower court did not make because it did not apply the proper standard.

In *Pickering v. Board of Education*, 1968, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811, the Court held that, absent proof of actual malice, a teacher's exercise of his right to speak on issues of public importance could not be the basis for his dismissal from public employment. The contents of Pickering's letter were examined to determine whether there was actual malice. As part of that evaluation, the Court mentioned that several of the statements would not come under that standard because they were substantially correct.

In *Beckley Newspapers Corp. v. Hanks*, 1967, 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248, the Court held that the instructions on actual malice were incorrect and then examined the record to decide whether the proof presented met the proper constitutional standard; and in *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin*, 1974, 418 U.S. 264, 282, 94 S.Ct. 2770, 41 L.Ed.2d 745, the Court reviewed the facts to insure that the speech involved was not protected under the federal labor laws.[1]

While in *Cox Broadcasting Corp. v. Cohn*, 1975, 420 U.S. 469, 489–90, 95 S.Ct. 1029, 43 L.Ed.2d 328, the Court said that the defense of truth is constitutionally required when the subject of the publication is a public figure, that does not necessarily mean that the Court's rule regarding *de novo* review of a jury's finding of actual malice requires a similar factual review when the jury's finding concerns solely the truth of the statement. Indeed, in *Cohn*, the truthfulness of the newspaper report was never an issue. *Cohn* was arguing that even though the report was true, its publication invaded his right of privacy. *Cohn* was not concerned with the appropriate appellate standard of review when evaluating a motion for a directed verdict or a judgment n. o. v. when the sole issue in dispute is the truthfulness of the statement.

B. *The merits.*

 Summa maintains that uncontradicted evidence regarding at least three specific incidents proves the truth of Hughes' statement. Under California law, Summa need not prove the literal truth of

---

1. The Circuit cases upon which Summa relies are distinguishable on similar grounds. *Vandenberg v. Newsweek, Inc.*, 5 Cir., 1975, 507 F.2d 1024, was an appeal from a judgment n. o. v. in favor of Newsweek. The Fifth Circuit assumed "arguendo that the statement at issue contained inaccuracies" (507 F.2d at 1026) and then made an independent examination of the record to determine whether clear and convincing evidence of actual malice had been presented. The court concluded that it had not. *United States v. Baranov*, 9 Cir., 1973, 474 F.2d 591; *Wasserman v. Municipal Court*, 9 Cir., 1971, 449 F.2d 787, *vacated on other grounds*, 413 U.S. 911, 93 S.Ct. 3036, 37 L.Ed.2d 1025; and *Childs v. Oregon*, 9 Cir., 1970, 431 F.2d 272, *rev'd on other grounds*, 1971, 401 U.S. 1006, 91 S.Ct. 1248, 28 L.Ed.2d 542, are obscenity cases, which we consider to be *sui generis*. In each, we conducted a *de novo* review to determine whether, under the applicable constitutional standard, the materials in question were constitutionally protected. That is not the question that confronts us. Here we deal with a jury's resolution of conflicts in a great mass of evidence, something that was not involved at all in the foregoing cases.

the allegedly defamatory accusation, "so long as the imputation is substantially true so as to justify the 'gist' or 'sting' of the remark." *Emde v. San Joaquin County Central Labor Council,* 1943, 23 Cal.2d 146, 160, 143 P.2d 2028; *Gantry Construction Co., Inc. v. American Pipe and Construction Co.,* 1975, 49 Cal.App.3d 186, 122 Cal.Rptr. 834, 838–39. See also *Restatement (Second) of Torts* § 581A, Comment f (1976). Applying that standard, after a careful review of the record, we conclude that there were sufficient disputed facts to require the case to go to the jury.

1. *The Tucson lease money.*

First, Summa claims that the uncontradicted evidence establishes that Maheu embezzled money which he was supposed to use to make lease payments to the Tucson Airport Authority (TAA) under a lease of a hangar. Summa executive Raymond Holliday and Maheu had worked out an arrangement under which Maheu was to pay the monthly rental to TAA on Summa's behalf. A few days before each payment was due, Summa sent Maheu at his Los Angeles office a check payable to Robert A. Maheu Associates in the exact amount required to cover that month's payment. Maheu testified that the checks were deposited in his firm's general account; and whenever there was a sufficient amount of money in the account, he made payments to TAA. Some were quite late. When the lease terminated, Maheu was holding approximately $74,-000 of this money and he was roughly nine months behind on the rental payments. It was not until September, 1967, or more than nine months after the payment was due, that Maheu made the final rental payment to TAA on Summa's behalf.

Maheu testified that there was no explicit arrangement between himself and Summa which required him to use the precise check he received from Summa to pay the rent, or to pay the rent when it became due. He testified that he did not view the checks as entrusted money but rather as payments made to enable him to render a service, i. e., to see that the rent was eventually paid.

He maintained that he could reasonably believe that he had the right to use the money so long as the rent was ultimately paid.

As improbable as Maheu's version may initially sound, it must be viewed in light of the overall relationship between Maheu and Hughes. Our description is based on Maheu's testimony. Maheu was first retained by Hughes in 1954 or 1955. Maheu's duties over the years were diverse, to say the least; but, basically, he served as a general troubleshooter. Hughes several times expressed his intention that Maheu would become his "alter ego," representing him before government agencies and maintaining contacts with the "outside world" from which Hughes had withdrawn. From 1961 through 1965, Maheu functioned as Hughes' personal representative at all levels of government and was involved in a wide range of business transactions. Despite his extensive work for Hughes, Maheu had never had a face-to-face conversation with his employer. All communication was by telephone or written memoranda. Maheu was often given authority to handle projects as he thought necessary and the financial arrangements which he maintained with Hughes and Summa were often rather "loosely" handled. The Tucson rent arrangement was of that type. While we may question Maheu's story that he honestly believed that he had authority to use the rent checks, still, in light of this rather unusual business relationship, his version does raise a factual question for the jury.

2. *The Silver Slipper incident.*

Next, Summa claims that the evidence establishes that Maheu committed theft by taking $59,000 from the Hughes-owned Silver Slipper casino in December, 1969. Maheu responds that he received the $59,000 as a loan in an arms-length transaction with Robert Morgan, a Summa employee. The only factual dispute is whether Robert Morgan was Maheu's subordinate who merely wrote out a check for Maheu on Maheu's orders or whether Morgan had authority on Summa's behalf to approve or reject Maheu's loan request.

Maheu testified that he had never done anything to exercise control over Morgan. Summa maintains that Maheu contradicted himself by testifying at one point, "I was not in a position where I had to explain anything to Mr. Morgan." (R.T. 10,447) Taking that statement in the context within which it was made, it is not clear whether Maheu was referring to his relationship with Robert Morgan in general or to his opinion of his responsibility to report one particular business deal to him. In addition, while the statement implies that Maheu never had to explain what he did to Robert Morgan, it does not clearly state that Morgan was under his authority on all matters. At most, it simply says that he was generally not under Morgan's authority.

Morgan testified that he took all his orders in Nevada from Maheu. But Collier, Summa's principal fiscal officer in Houston, testified that he had sent Morgan to Nevada and that Morgan was responsible for compiling financial statements for the Nevada casinos. Holliday, the executive vice president of Summa, stated that, to his knowledge, Morgan reported to Collier and was not under Maheu's supervision or direction.

Overall, Maheu's role in the Hughes organization was ambiguous at best. At some points, Summa executives seemed to be in control (e. g., the day to day operation of the casinos); and at other times, Hughes relied on Maheu (e. g., land acquisition, political contributions, etc.). On the basis of the evidence presented, Summa failed to establish conclusively that Maheu stole the $59,000. Again, this is a question of fact for resolution by the jury.

### 3. The political contribution money.

Finally, Summa points to $100,000 which Maheu received from Hughes' personal bank account in May, 1970, ostensibly for political contributions which, as was later discovered, he had not paid. Maheu explained that he often made the political contributions first and then later asked Hughes to reimburse him for the expenditures. He said that the political funds which he distributed were so loosely handled that his accountant made an error and on that basis Maheu requested the money unnecessarily. His accounts showed that the $100,000 was for political contributions of which approximately $13,000 had been so used, and the remaining $87,000 appeared on his books as a debt Maheu owed Hughes. While again this version may be difficult to believe, it comes down to the credibility of Maheu's testimony that he relied upon his accountant's error and that Hughes approved of such "loose" accounting procedures. Again, this is a factual question for the jury to resolve. While we might not have reached the same conclusion as the jury, that is not the proper standard of appellate review.

The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. . . . That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.

*Tennant v. Peoria & P. U. Ry. Co.*, 1944, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520.

### IV. Inconsistent Verdicts.

The next question is whether the jury's award of approximately $2,350 to Summa as the interest value of the money supposedly earmarked for TAA rental payments and temporarily used by Maheu is inconsistent with the general liability verdict. Summa contends that the interest award could be justified only if the jury concluded that Maheu had no right to use the funds for personal purposes and that

therefore the jury must have found him guilty of embezzlement. If the monies had not been entrusted to him for a particular purpose, he could have used them without any personal liability. Therefore, according to Summa, because the two verdicts are hopelessly inconsistent, a new trial is required.

 We should reconcile the jury's verdicts whenever possible. *Gallick v. Baltimore & Ohio Railroad*, 1963, 372 U.S. 108, 119, 83 S.Ct. 659, 9 L.Ed.2d 618 and we are able to do so in this case. Summa's argument hinges upon its assertion that embezzlement as a matter of California and Arizona law[2] is established when a person, having been entrusted with money or other property for a particular purpose, intentionally diverts the money or property to a different personal use. The only intent required is that the person intend to divert the funds entrusted to him to his own use.

 Under California law,[3] when an individual honestly believes that he is authorized to appropriate and use property which he is accused of embezzling, the fraudulent intent which is a necessary element of that crime is absent. Cal.Pen.Code § 511; *People v. Stewart*, 1976, 16 Cal.3d 133, 139, 127 Cal.Rptr. 117, 544 P.2d 1317. *See People v. McManus*, 1960, 180 Cal. App.2d 19, 40, 4 Cal.Rptr. 642. *See also, State v. Scofield*, 1968, 7 Ariz.App. 307, 310–11, 438 P.2d 776.

Here Maheu testified that he did reasonably believe that he had a right to use the money in his business so long as the rent was ultimately paid. Thus, he argues, he lacked the criminal intent necessary to be guilty of embezzlement. He had agreed to make the rental payments as a favor to Summa because of some alleged tax benefit. He did not view the particular checks which he received as being earmarked solely for the TAA rent. The checks were

drawn to "Robert A. Maheu Associates" and never designated Maheu as a fiduciary or specified their purpose. They were deposited in the general account at Robert A. Maheu Associates (RAMA) and when there was enough money in the account, a rent check was sent to TAA. Maheu said that this procedure was in keeping with the rather informal nature characterizing most of the financial arrangements between himself, Hughes and Summa.

The jury was instructed that in the crime of theft a certain specific intent was required. More specifically:

> In the crime of theft by embezzlement, there must exist in the mind of the perpetrator the specific intent to fraudulently appropriate the money or other property entrusted to him to any use or purpose not in the due and lawful execution of his trust.

(R.T. 12,605)

That instruction was correct.

While, again, we might not decide this factual issue in the same manner, nevertheless, the jury could reasonably conclude from the evidence presented that Maheu lacked the necessary fraudulent intent to commit the crime of embezzlement. At the same time, the jury could have decided that Maheu was incorrect in assuming that he was authorized to use the money, thus, justifying an award of interest for the time period that the money was used for other purposes. On that basis, the verdicts are not inconsistent.

## V. *Sufficiency of Maheu's Rebuttal Evidence.*

 Summa argues that Maheu's evidence in rebuttal to Summa's prima facie showing of criminal conduct in regard to four other transactions was inadequate to support the verdict. Those four instances are (1) Maheu's overbilling for a Tucson

---

**2.** The criminal law governing this transaction would be that of California (where the monies were received by Maheu) and Arizona (the situs of the lease pursuant to which the monies were sent to Maheu).

**3.** The applicable Arizona statute (Ariz.Crim. Code § 13–681) was patterned after Cal.Penal Code § 503, the applicable California statute; and Arizona courts look with great interest to California decisions. *State v. Mackey*, 1971, 15 Ariz.App. 417, 419, 489 P.2d 80, 82.

guard operation; (2) the disappearance of $50,000, an alleged cash contribution for former Vice-President Humphrey; (3) the disappearance of $50,000 withdrawn from the Hughes-owned Sands Hotel; and (4) misuse of Summa employees.

In response to those accusations, Maheu testified (1) that Hughes told him to make a "substantial profit" on the guard operations, that he was not to disclose the profit to Hughes' executives, and that therefore the profit was disguised in the form of overbilling; (2) that he delivered the $50,000 in cash to Vice-President Humphrey by leaving it in an attache case in his limousine; (3) that he never received $50,000 from the Sands Hotel; and finally, (4) that Hughes knew about his use of Summa employees and approved. Assuming that the jury believed Maheu's version, and the verdict indicates that they did, Maheu's rebuttal evidence was sufficient.

### VI. *Jury Instructions.*

Summa challenges three parts of the court's instructions.

### A. *Comment on Maheu.*

We turn first to its argument that the judge's comment concerning Maheu was unfair and prejudicial.

After instructing the jury on the applicable law, and just before sending them out to deliberate, the trial judge chose to comment upon the evidence by stating his opinion of Maheu. Here is what he said:

Now, ladies and gentlemen of the jury, it is within my province as Judge to assist the jury in arriving at a just conclusion by commenting upon the evidence and upon the credibility of witnesses in this case.

However, I hasten to add that it is the exclusive province of the jury to determine the facts from the evidence and to pass upon the credibility of all witnesses. I want to emphasize that the jury is not bound, in any way, by the Judge's comments upon the evidence and credibility of witnesses and may, if it so chooses, completely disregard all such comments

of the Court. In short, the jury is the final arbiter of the credibility of the witnesses and of the facts shown by the evidence.

Now, ladies and gentlemen, this has been a very long and involved case. The evidence is, to say the least, complex. The Court suggests that to put the evidence in this case in proper perspective, you should view it in the light of the extraordinary relationship that existed between Mr. Maheu and Mr. Hughes. That relationship is evidenced, in part, by copies of the 80 or so handwritten memos that passed from Mr. Hughes to Mr. Maheu. Those pieces of paper give us a glimpse into the minds of the people enmeshed in this case.

Now, Mr. Maheu has testified that the 80 or so written memos which are in evidence represent a fraction of the memos that passed between him and Mr. Hughes. As I recall, Mr. Maheu testified that he returned all of the memos to the aide, Mr. Crawford, except one that involved the voting trust matter. Other than the voting trust memo, the other handwritten memos in evidence, except for Exhibit 18 which Summa produced, were obtained, according to Mr. Maheu, from Mr. Vogliotti, a Las Vegas freelance writer who got them from a disenchanted former Hughes employee by the name of Johnny Meier. That was Mr. Maheu's testimony.

As to the remaining memos, they have not been produced; they are gone; we don't know who's got them. We can't consider them.

Now, ladies and gentlemen, the credibility of a witness is important. The most important live witness that we have heard from in this case is Mr. Maheu. To me Robert A. Maheu is an enigma, a puzzlement. On one hand he can be described as affable, intelligent, imaginative, articulate. He is a friendly man with important friends in high places. He has enormous energy and drive and the ability to get things done. Apparently, it was because of these assets that

Robert Maheu served as Howard Hughes' ambassador-at-large. Looked at from another angle, Mr. Maheu appears to be talkative, somewhat naive, artless, careless, imprecise. An overly-trusting man whose personal affairs were in a state of disarray. Although Mr. Butler, the tax lawyer, described his client Maheu as a walking calamity, I would describe him as a walking paradox.

Undoubtedly he is possessed of some unusual talents, but like all men he has his share of foibles. I think his anecdote about locking himself out of his car on his first FBI assignment provides some insight in that area.

Now, ladies and gentlemen of the jury, these are my brief comments. I hope that they prove of some assistance to you in arriving at a just verdict on the liability issue. Again, I stress to you that you are the final and sole arbiters of the facts and of the credibility of the witnesses who have testified in this case and you are at liberty to disregard all comments of the Court upon the evidence and the witnesses.

(R.T. at 12,616–18).

Maheu responds to Summa's challenge to those comments by arguing (1) that Summa waived its right to attack the comments under F.R.Civ.P. 51 because its objection was made after the jury retired to consider its verdict and (2) that assuming the objection was timely, the comments were not prejudicial.

### 1. *Waiver.*

Plaintiff cites Rule 51, F.R.Civ.P.:

No party may assign as error the giving or the failure to give an instruction unless he objects thereto *before the jury retires to consider its verdict*, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury.

(Emphasis added.)

In this case, after the court completed the instructions, and within the hearing of the jury, the judge asked whether counsel had any further objections. Summa's attorney responded that he did not. At that point, after indicating that he would ask the bailiffs to make immediate arrangements for the jury's lunch, the judge ordered that the jury be shown to the jury room. Uncontradicted affidavits submitted by Summa's attorneys state that handwritten objections to the judge's comments were submitted to the court within fifteen minutes after the jury went out and court recessed, and that at all times before the delivery of that memorandum and for at least thirty minutes afterward, the jury was not in the jury room, which had been left open and unattended. The judge had specifically instructed the jury that it was to discuss the case only when all the jurors were together in the jury room. Thus it appears that the objection had been transmitted to the court before the jury had begun deliberations.

"The purpose of Rule 51 in general is to give the trial judge an opportunity to reconsider any ruling that he may have made, and if he is convinced that he is in error to reinstruct the jury prior to its deliberation." *Cosper v. Southern Pacific Co.*, 9 Cir., 1961, 298 F.2d 102, 104 (footnote omitted). Neither side had any idea that the court was going to comment on Maheu or his credibility. Thus counsel was caught completely off guard. He obviously did not want to object in front of the jury. While Summa's counsel should, more appropriately, have asked for permission to approach the bench or for an opportunity to discuss the matter outside the presence of the jury, the objection was still raised before the jury had begun to consider its verdict. While this procedure is not recommended, the purpose of the rule is not thwarted by our finding that the objection was timely. Here the court had an opportunity to consider Summa's objection before the jury had begun deliberations. Thus, the court was given a chance to reconsider its instructions and to

offer a curative instruction if it had concluded that one was necessary.[4]

### 2. *Prejudice.*

The next question is whether the judge's comments were prejudicial. The trial judge is not limited to "instructions of an abstract sort" and "it is within his province, whenever he thinks it necessary, to assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence by drawing their attention to the parts of it which he thinks important." *Quercia v. United States*, 1933, 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 1321. But that power has inherent limitations which were carefully stated by Mr. Chief Justice Hughes in *Quercia*:

> His discretion is not arbitrary and uncontrolled, but judicial, to be exercised in conformity with the standards governing the judicial office. In commenting upon testimony he may not assume the role of a witness. He may analyze and dissect the evidence, but he may not either distort it or add to it. His privilege of comment in order to give appropriate assistance to the jury is too important to be left without safeguards against abuses. The influence of the trial judge on the jury "is necessarily and properly of great weight" and "his lightest word or intimation is received with deference, and may prove controlling." This Court has accordingly emphasized the duty of the trial judge to use great care that an expression of opinion upon the evidence "should be so given as not to mislead, and especially that it should not be one-sided"; that "deductions and theories not warranted by the evidence should be studiously avoided." 289 U.S., at 470, 53 S.Ct. at 699.

*See also, United States v. Stephens*, 9 Cir., 1973, 486 F.2d 915.

We are persuaded that the comment went too far in this case. The comment was not a carefully balanced appraisal of the voluminous conflicting evidence, or of Maheu's credibility. Rather it directed the jury's attention to Maheu's "assets" and "unusual talents." Maheu was described as "affable, intelligent, imaginative, articulate," "a friendly man with important friends in high places," and "a man of enormous energy and drive" with the "ability to get things done." While that description may be accurate, not all the evidence supported that view. Yet, the only "negative" traits which the court mentioned were that Maheu was "talkative, somewhat naive, artless, careless, imprecise," "an overly trusting man whose personal affairs were in a state of disarray," a man "like all men" with "his share of foibles," who locks himself out of cars. This glowing character reference failed to mention Summa's contentions that Maheu was dishonest, a thief, an embezzler, and a perjurer, a contention that was supported by a mass of very persuasive evidence.

Maheu's credibility was *the* crucial factor in the entire case. Time after time the resolution of a critical factual issue came down to a choice between Maheu's version and either directly contrary testimony by other witnesses or by Maheu himself on other occasions, or extremely damaging circumstantial evidence. Maheu was well aware that Hughes would not testify, and he took full advantage of that fact. In response to the evidence relating to instances in which he acquired money from Hughes or Summa in most peculiar and damning circumstances, his explanation was that, in a private conversation with Hughes, to which no one was privy, and of which there was no record, he was told to do what he did.

We cite but one example. He was supposed to provide full time guard service, around the clock, for certain properties in Tucson owned by Summa. He submitted bills for those services. On their face they showed hours of work by each guard, and an hourly rate of pay. They were false.

---

4. The fact that the trial judge chose to wait until the following morning to hold the hearing on the objection does not alter our conclusion.

They showed many more hours, and substantially higher rates of pay, than were in fact furnished and paid, to the tune of many thousands of dollars. Maheu did not deny that the billings were false. He said that Hughes told him to make a good profit from furnishing the guards, and to conceal from the executives of Summa the fact that he was making a profit. His explanations of other instances were equally bizarre. But they had one thing in common. They rested on private, unrecorded conversations between him and Hughes.

Maheu was thoroughly and convincingly impeached. He was flatly contradicted on many matters by many witnesses. His response, as to most of them, was that they lied. He was also contradicted by contemporaneous records. He repeatedly flatly contradicted testimony that he himself had given under oath either in other litigation or in his depositions. Some of his explanations were ludicrous. Sometimes all he could say was that he "could see no conflict." More than once, when he was floundering around for an explanation, the judge interrupted with a leading question embodying an explanation which Maheu gratefully adopted. Nothing can be more damaging to a cross-examination of a lying, prevaricating, equivocating, mendacious, dishonest, deceitful, untruthful, tergiversating witness. From our reading of all of his testimony, it can be persuasively argued that he was just that kind of witness, or at least the jury could have so found.

In face of the foregoing, we are at a loss to understand why the judge made the comment on Maheu that he did. It is, in essence, a personal character reference for the man.

[T]he credibility issues before the jury were close, difficult and extremely important. In such a case commenting on the evidence is a perilous endeavor, to be undertaken with caution lest the slightest suggestion of favor for one side or the other from the supposedly impartial moderator tip the balance and impel a decision. Here the trial judge, in the guise of fair comment, overreached and by adding

evidence on the credibility of a key witness seriously impaired appellant's right to a fair and impartial trial.

*United States v. Cisneros,* 5 Cir., 1974, 491 F.2d 1068, 1076.

The court here did tell the jurors that they were free to disregard his comments on the evidence, but that was not sufficient to cure the error. The impact of the comment is not so easily mitigated. *Quercia, supra,* 289 U.S. at 472, 53 S.Ct. 698; *United States v. Jacobo-Gil,* 9 Cir., 1973, 474 F.2d 1213, 1216; *Cal-Bay Corp. v. United States,* 9 Cir., 1948, 169 F.2d 15, 23, *cert. denied,* 335 U.S. 859, 69 S.Ct. 134, 93 L.Ed. 406.

The timing of the comment—immediately before the jury retired to deliberate—further assured it a strong impact. *See Caskey v. Village of Wayland,* 2 Cir., 1967, 375 F.2d 1004, 1009. The court then compounded its error by ordering that its oral comments be transcribed and included in the written booklet of instructions submitted to the jury.

We have no choice but to reverse the judgment on the ground that the trial court's one-sided characterization of Maheu came close to directing a verdict in his favor, thus denying Summa a fair trial. *Gordon Mailloux Enterprises, Inc. v. Firemen's Ins. Co.,* 9 Cir., 1966, 366 F.2d 740, 742–43; *Harding v. United States,* 9 Cir., 1964, 335 F.2d 515.

### B. *Other instructions.*

We consider Summa's attack on certain other instructions because the same issues may be presented at a new trial.

### 1. *Refusal of instruction on misconduct of a fiduciary.*

Summa next argues that the court committed reversible error by refusing to instruct the jury that proof of serious misconduct by a fiduciary, whether or not it was strictly criminal, would justify the slanderous utterance. The argument is that the court turned a defamation case, in which the defense of truth requires merely that the gist of the statement be proved, into a criminal proceeding by defining all the ele-

ments of the crime of theft and failing to define dishonesty in terms of what would amount to fiduciary misconduct. We do not think that this is what happened.

The instructions of which Summa complains cover three pages of the Reporter's transcript, and they were accurately summarized by the judge on the last of those pages as follows:

> Just briefly, and I will repeat it, Summa is contending that the words uttered by Mr. Hughes mean that Mr. Maheu acted dishonestly. Maheu agrees that at the very least the words charge him with dishonest conduct. But, it is Maheu's contention that the words charge him with more than dishonesty, they charge him with criminal misconduct, theft. So Maheu has the burden of persuading the jury or convincing the jury by a preponderance of the evidence that the words mean theft.
>
> Now, if you are satisfied that the words mean theft, then Summa to prove truth has to prove theft. It is that simple. But, on the other hand, if Maheu does not sustain the burden of proving that the words mean theft, then you are left with the charge of dishonesty, and Summa, to sustain its burden, then would have to show that Maheu acted dishonestly.
>
> And all those burdens, of course, have to be satisfied by what we call a preponderance of the evidence, which I will define in a few moments for you. Is this clear to you, ladies and gentlemen? [R.T. pp. 12,592–93]

■ The jury was also instructed on principal-agent and on non-agency contractual relationships and duties for their consideration in determining whether Maheu acted dishonestly, if they had decided that that was the gist of the statement. The final choice as to the meaning of the words was left to the jury; and the instructions on the law applicable to each of the two possible interpretations were correct.

2. *The Nevada crime of graft.*

■ Summa argues that the judge erred in not including an instruction based on Nevada's criminal grafting statute.[5] It maintains that if the jury concluded that the gist of the statement was that Maheu had committed a crime, then Summa was entitled to an instruction defining the crime of grafting. The court refused on the grounds that it was highly unlikely that an average person who heard the words would come to the conclusion that Hughes was referring to that criminal statute and that if Maheu had violated that statute, he would at the same time have also committed one of the other statutory crimes of theft about which instructions were given. On this point, we must disagree with the trial court.

Precisely which criminal statute Maheu may have violated was not the issue. The question (assuming that the jury interpreted the gist of the statement to be that Maheu committed a crime of theft) was whether Maheu had engaged in conduct which violated some criminal theft statute. Once the trial court instructed the jury on certain specific crimes—i. e., larceny, false pretenses and embezzlement—it was error to refuse to allow the jury to consider whether proof of another crime based upon the improper taking of money by a fiduciary would justify Hughes' words. Grafting is a crime which, like embezzlement, involves misappropriation directed by an agent against his principal. Because a charge of theft may be reasonably interpreted as charging any form of criminally punishable misappropriation, the requested grafting instruction was proper. *See Restatement (Second) of Torts* § 581A, Comment f (1976).

Because the jury returned only a general verdict, one cannot determine whether it

5. The pertinent parts of the Nevada statute read:

> Grafting by Employee: Penalty. Every agent, employee or servant of any person or corporation who shall ask or receive, directly or indirectly, any compensation, gratuity or reward, or any promise thereof, upon any agreement or understanding that he shall act in any particular manner in connection with his principal's, employer's or master's business . . . shall be guilty of a gross misdemeanor. Nev.Rev.Stats. § 613.110.

found that the gist of the statement was that Maheu committed a crime or merely that he was dishonest. If the jury did decide that the statement meant that Maheu had committed a crime, then the general instruction on the principal-agent relationships and non-agency contractual relationships would not have been relevant and would not alleviate any error caused by omitting the grafting instruction.

Nor did the general instructions on false pretenses, or larceny or embezzlement include precisely the same elements as are required for a grafting conviction. The four instances which Summa claimed justified such an instruction—the so-called "Herman Greenspun," "Edward Morgan," "Charles Blaisdell" and "Rainbow Acres" transactions—provide clear examples of this problem. In none of those was Maheu necessarily accused of (1) making a false representation to anyone with the specific intent to defraud the owner of his property (false pretenses); (2) fraudulently appropriating money or property entrusted to him (embezzlement); or (3) stealing, that is, taking the personal property of another with the specific intent to deprive the owner permanently of his property (larceny). Instead, Summa maintained that in each of those four specific incidents (three of which clearly took place in Nevada), Maheu received a kickback for arranging certain business deals on behalf of Summa. Such kickback arrangements would result in profit to Maheu at Summa's expense, Maheu having failed to pay the kickbacks to Summa, and the facts as Summa claims that they existed would have been sufficient to prove the crime of graft in Nevada. For this reason also, the instruction should have been given.

### VII. Admission of Allegedly Prejudicial Testimony.

Summa argues that the trial court abused its discretion by refusing to declare a mistrial after Maheu testified that Hughes directed him to offer a bribe to former President Johnson. The specific testimony which Summa challenges begins as follows:

> [Hughes] wanted me to suggest to President Johnson that he, Howard Hughes, was prepared to give [President Johnson] a million dollars, after he left the office of the presidency, if he would stop the atomic testing before he left office. (R.T. at 9,177–78)

That statement, in addition to Maheu's continual references to the incident, according to Summa, hopelessly distorted the jury's determination of the issue of the truth of Hughes' statement by arousing their "natural outrage toward an alleged briber of the President." (Summa's Opening Brief at 75). We agree.

The Judge allowed the testimony only to show the relationship between Maheu and Hughes and instructed the jury to that effect. (R.T. 9,175.) However, there was a great deal of evidence about the relationship between Hughes and Maheu. We find it difficult to believe that the evidence in question was offered for any purpose other than to blacken Hughes' character, which was not in issue. The evidence should be excluded in another trial.

### VIII. Damages.

Summa attacks the $2.8 million compensatory damages award as grossly excessive and unsupported by competent evidence. We conclude that the award was based on inadmissible speculative evidence, and so do not reach the question of whether it was excessive.[6]

Summa argues that Maheu's evidence of the value of his estimated lost earning ca-

---

**6.** At oral argument, counsel for Maheu asserted that Summa had failed to preserve its objections to Maheu's trial testimony concerning his future earnings. We disagree. When Summa learned of Maheu's anticipated trial testimony by taking his deposition before the damage phase of the trial began, it moved *in limine* for an order barring such testimony. The court stated that it would rule when it heard the testimony. (R.T. 13,512–13.) When Maheu offered the evidence at trial, Summa objected and moved to strike the testimony. The court denied the motion. (R.T. 13,578–79.) Summa also objected and moved to strike the testimony of Maheu's expert, Neffeler, which was based upon Maheu's testimony. That motion

pacity was impermissibly conjectural.[7] We agree. Maheu testified that he would have earned $300,000 annually after taxes, and he based that estimate on four factors. First, he "intended" to earn $600,000 gross income from spare-time employment. He said that he "planned" to divide his time not spent working for Maday, his then current employer, into six segments and to sell each segment for $100,000. Next, he estimated that he would have received a $100,000 stock bonus from Maday in addition to his $40,000 annual salary.[8] Maheu then assumed that his annual expenses would be about $140,000, without producing any testimony or documents particularizing the various expense items, past or future. The final computation was presented as follows:

| | |
|---|---|
| Spare Time Income | $600,000 |
| Salary from Maday | 40,000 |
| Gift from Maday | 100,000 |
| Gross Income | $740,000 |
| Less Expenses | (140,000) |
| | $600,000 |
| Less Taxes | 300,000 |
| (Assumed to be at a 50% Rate) | |
| Net Income after Taxes | $300,000 |

Any problem caused by using this evidence was then compounded by the testimony of Neffeler, a "business economist" and Maheu's single expert witness, whose purpose was to give expert testimony as to the present value of Maheu's lost future earnings. His testimony was based on three assumptions:

(1) that Maheu's potential after-tax income prior to the defamatory statement was at least $300,000 per year;

(2) that Maheu's salary since January, 1972, was $40,000 per year plus certain fringe benefits; and

(3) that Maheu faced no mandatory retirement age and could have worked for as long as he desired.

On the basis of those assumptions, in addition to several of his own, Neffeler calculated six alternative "bottom-line" figures purporting to represent the present value of Maheu's allegedly lost earning capacity. Each of the six figures was based on Maheu's valuation of his earning capacity prior to Hughes' defamatory statement at $300,000 per year after taxes. Each included a "tax allowance" component, the largest being in excess of $2,000,000. Neffeler's four largest figures also included an "inflation" component, reflecting an assumed increase in Maheu's earning capacity consistent with an annual increase of 6% in the cost of living. In addition, the two largest numbers also included a "gross national product" factor, reflecting an assumed increase in Maheu's income consistent with a 3% increase in the GNP. The largest GNP component was $2,332,400. The largest total figure calculated by Neffeler was $8,633,850.

All of this, except that Maday was paying Maheu $40,000 per year, is sheer fantasy, nothing more. While Maheu "planned" to sell his spare time for $600,000 per year, he testified that he had disclosed this plan to no one before 1974 and that, although he had thought of prospective buyers, he had not approached any of them. Maheu's af-

was also denied. (R.T. 13,742–43.) At the close of the case, Summa moved to strike the testimony concerning Maheu's earning capacity, and the trial court denied that motion. (R.T. 14,970.) Summa sufficiently preserved its objections.

7. The trial judge instructed the jury that the amount of the damage award should include the following:

1. Any impairment of reputation and standing in the community. In determining the amount of impairment of reputation and standing in the community the jury may consider the present cash value of earning capacity, if any, reasonably certain to be lost in the future by reason of the false defamatory words. In addition, the jury may consider the reasonable value of lost earning capacity, if any, suffered from the date the false defamatory words were uttered to the present. And,

2. Any personal humiliation and mental anguish and suffering.

8. Maheu testified that Maday had promised him a potential gift of 25% of his businesses and estimated that the gift, if made, would be worth $50,000 to $100,000 per year.

ter-tax income for the years preceding Hughes' statement had never approached $300,000. In no single year, during the period 1961–1971, had Maheu earned more than $162,000 after taxes. Maheu's average annual after-tax earnings for that eleven year period were $40,368, and his average annual after-tax earnings for 1967–1971 were $2,661. While Maheu is entitled to express his opinion as to his own earning capacity, he must have some factual basis to support it. None was presented.

In *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 9 Cir., 1969, 416 F.2d 71, *cert. denied*, 1970, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755, we encountered a similar situation. That case was a private antitrust action in which Hawaiian Oke sought to recover damages measured by the value of its lost business. The proof on which Hawaiian Oke relied is similar to Maheu's. It consisted of charts showing projected yearly profits, prepared by an "expert" accountant and based on assumed future profits which had been supplied to him by Hawaiian Oke's manager and attorney and which, like Maheu's plans, had no factual support. The expert used these projected earnings to arrive at an annual profit figure which he then capitalized by multiplying by figures ranging from 5 to 10 to arrive at a "suggested fair market value of the business." We said:

> Capitalization of a purely speculative profit figure at *any* rate may make the result look very impressive, but the result is no less speculative than its basis.
>
> Plaintiff's charts are an "array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it." (Friendly, J. in *Herman Schwabe, Inc. v. United States Shoe Machinery Corp.*, 2 Cir., 1962, 297 F.2d 906, 912.) They should not have been admitted.
>
> We are fully aware that "the plaintiff is not required to prove with mathemati-

cal certainty the amount of its damage resulting from a defendant's violation of the antitrust laws." *Richfield Oil Corp. v. Karseal Corp.*, 9 Cir., 1959, 271 F.2d 709, 714. But this does not mean that the door is open to present to a jury the kind of rampant speculation that went to the jury in this case. 416 F.2d at 87.

We reach the same conclusion here. On that basis alone, the damages award must be reversed, but at least two of the assumptions added by Neffeler also support this conclusion.

The first is the "tax allowance." This controversy does not involve the tax exempt status of personal injury damage awards but rather focuses upon the amount of taxes that Maheu would have to pay upon the interest accruing from his investment of his award. In other words, assuming that Maheu's future (after-tax) earnings would be $300,000, it was assumed that, when he invested that amount, he would be taxed upon any earned interest. Neffeler added an allowance for that tax to his bottom-line figures. Summa maintains that including this factor was error.

Like the $300,000 figure itself, the notion that Maheu would invest that amount and receive from it a substantial income, on which he would then pay large taxes, is sheer fantasy. It is even more fanciful than the $300,000. If the evidence in this case demonstrates anything, it demonstrates that no matter how much money Maheu got his hands on he either spent it or dissipated it in speculative investments that did not succeed. When Hughes fired him, he was indebted to Hughes/Summa to the extent of nearly half a million dollars, and he could not pay any of it. That is evidenced by the $470,000 plus judgment against him in this case, from which he has not appealed. We need not decide whether such a "tax allowance" computation might be proper in another case.[9] Here there is no evidence to support it, and it should not have been received.

---

9. *See Southern Pacific Co. v. Guthrie*, 9 Cir., 1949, 180 F.2d 295, 302, n.7, *cert. denied*, 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343.

We also question Neffeler's use of a projected 3% increase in the gross national product in computing two of his figures indicating Maheu's projected earning capacity. We have not been able to find any California law allowing the use of an estimated increase in productivity in computing future earnings.[10] Moreover, no correlation between Maheu's earnings and changes in the GNP was established. Therefore, in this case we find the use of this factor also to be far too speculative.

■ Overall, we conclude that, given the evidence, the jury's compensatory damage award cannot stand. As the Supreme Court stated in *Gertz v. Robert Welch, Inc.*, 1974, 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789, " . . . all awards must be supported by competent evidence concerning the injury." We cannot determine to what extent the jury relied upon the improperly admitted evidence, but we have no doubt that the pervasive use of these unsupported figures requires reversal.[11]

IX. *Dismissal of Summa's Counterclaim.*

■ During trial, the court granted Maheu's motion to strike Summa's counterclaim for $2,120,000 based on losses allegedly caused by Maheu's mismanagement of its assets. The amount claimed was the aggregate paid Maheu in retainer fees for 1967–1970 based on Summa's argument that where serious intentional fiduciary breaches have occurred, an agent forfeits all compensation. *J. C. Peacock, Inc. v. Hasko*, 1961, 196 C.A.2d 353, 357–61, 16 Cal.Rptr. 518, 521–24. Rest. (2d) of Agency § 469 (1957). The trial court's ruling was based upon Summa's earlier stipulation to restrict this

counterclaim to liquidated damages in return for Maheu's agreement to a bifurcated trial.

The trial judge concluded that Summa had failed to present evidence indicating either the reasonable value of the services Maheu did perform or the exact time period during which the breach of fiduciary duties occurred. Thus Summa's claim was unliquidated because no legal criteria could be applied to the facts that would produce a definite or certain sum to which Summa would be entitled. Summa's subsequent motions to amend its counterclaim were denied in part because Maheu would have been prejudiced by his lack of discovery and depositions concerning the compartmentalizing of Maheu's retainer fees which Summa sought to achieve in its proposed amendment.

Summa responds by arguing that the sum to which it was entitled was "readily calculable and, therefore, liquidated." It says that because Maheu was paid a yearly retainer rather than fees for individual services, any single act constituting a wilful and deliberate breach of his fiduciary duty would result in his forfeiture of all compensation for that year. The trial court disagreed that a year was the proper time period.

Because we agree with the trial court that Maheu's compensation was apportionable, and because Summa failed to establish the exact time period during which the alleged breach occurred, we agree that the damages were not liquidated and the motion to strike the counterclaim was properly granted. *See Wilshire Oil Co. v. Riffe*, 10 Cir., 1969, 406 F.2d 1061, *cert. denied*, 396 U.S. 843, 90 S.Ct. 105, 24 L.Ed.2d 92.

---

10. Maheu relied upon *Huddell v. Levin*, D.N.J., 1975, 395 F.Supp. 64, and *Turcotte v. Ford Motor Co.*, 1 Cir., 1974, 494 F.2d 173, to support Neffeler's use of this figure. *Turcotte* applied a specific Rhode Island statute which explicitly allowed the consideration of economic trends when computing damages. And the Third Circuit vacated the district court's decision in *Huddell* and remanded for a new trial, in part because of improper testimony by the plaintiff's economic expert. The court there stressed that "a jury award may not be based

merely on speculation or conjecture." *Huddell v. Levin*, 3 Cir., 1976, 537 F.2d 726, 743.

11. Summa also contends that Maheu failed to establish a correlation between the 6% inflation factor and his earning capacity. Under California law, an estimate of future inflationary trends may be taken into account when computing future lost earnings. *United States v. English*, 9 Cir., 1975, 521 F.2d 63, 74. The use of that figure was not error.

## X. *Proper Rate of Interest.*

Finally, Summa claims that the trial court (1) erroneously refused to grant Summa's motion for a directed verdict on Summa's counterclaim for interest on the $74,-166.62 of TAA rental monies that Maheu used for approximately nine months; (2) erroneously failed to instruct the jury that it must figure interest at the legal rate of 7% under Cal.Civ.Code § 3336; and (3) erroneously denied Summa's motion for an order amending the judgment to reflect the proper interest rate.

█ Maheu responds that the verdict on the counterclaim does not establish a conversion, thus Cal.Civ.Code § 3336 is not applicable. We agree. Because the characterization of Maheu's use of this money was an area of factual dispute, the issue of whether Maheu owed interest and, if so, how much was a question for the jury. Directed verdict would not have been proper. No amendment to the judgment is required. We find no error. 5A Moore's Federal Practice ¶ 50.02[1] (2d ed. 1975).

## XI. *Punitive Damages.*

█ In his appeal, Maheu challenges the trial judge's granting of a partial judgment in favor of Summa on Maheu's claim for punitive damages. The basic issue which his appeal raises is whether a public figure in a defamation case may be awarded punitive damages when actual malice under the *New York Times* standard is established. The district court concluded that California Civil Code § 3294[12] is unconstitutional to the extent that it allows punitive damages in such a case and granted Summa's motion for a partial summary judgment on that basis. *Maheu v. Hughes Tool Co.,* C.D.Cal., 1974, 384 F.Supp. 166.

The district court first noted the Supreme Court's aversion to awarding punitive damages in defamation cases because of the chilling effect upon First Amendment rights when an individual is faced with the threats of costly litigation and possibly enormous damage awards and then concluded that public figures should not be given such awards in defamation actions "unless they narrowly and necessarily further important and substantial state interests." 384 F.Supp. at 170. The state's interest in protecting an individual's reputation and privacy by deterring such statements was found not to be a compelling justification for the limitations imposed upon First Amendment freedoms. The court finally concluded that the statute's use of punitive damages as a means to protect against the "special dangers flowing from highly motivated, tortious conduct" was too broad. 384 F.Supp. at 172. Because the jury was given unbridled discretion to determine the propriety and amount of punitive damages and hence to punish unpopular views, the statute was not narrowly restricted to deterring such reprehensible conduct. Less restrictive alternatives were available.[13] We again disagree.

While the Supreme Court has shown a dislike for the use of punitive damages in cases involving First Amendment rights, it has left open the question of whether they can be awarded in situations in which the high and protective standard of actual malice has been met. In *Gertz v. Robert Welch, Inc.,* 1974, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789, the Court held that the *New York Times* protection was not available for someone who defamed a private individual, even though the statements related to a matter of public interest. As long as the states did not impose liability without fault, they could define for themselves the appropriate standard of liability

---

12. Cal.Civ.Code § 3294 states:

 In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.

13. The alternatives suggested by the court were

 (1) placing a dollar limit upon the amount of recoverable punitive damages;

 (2) confining punitive damages to a particular multiple of actual damages; and

 (3) awarding court costs and attorney's fees.

for a publisher of a defamation which injured a private individual. However, the Court restricted its announcement of a less demanding showing than that required in *New York Times*, by limiting the private individual's recovery to compensation for actual injury. The Court then went on to state that ". . . the States may not permit recovery of . . . punitive damages, . . . when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." 418 U.S. at 349, 94 S.Ct. at 3011. To us, the implication of the Court's use of the double negative is that punitive damages may be permitted when actual malice is proven.

Thus far, the four Circuits which have considered the issue have reached that conclusion. In *Goldwater v. Ginzburg*, 2 Cir., 1969, 414 F.2d 324, *cert. denied*, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695, a pre-*Gertz* decision, the Second Circuit allowed the imposition of a total of $75,000 in punitive damages once actual malice had been shown. The court concluded:

> The book, magazine or newspaper publisher who with actual malice prints defamatory falsehoods about a public official or public figure has put himself beyond the pale of the First Amendment. A jury award of punitive damages against one who publishes falsehoods with actual malice serves two wholly legitimate purposes: (1) the protection of the libeled individual's reputation and (2) the protection against like abuse of all other persons similarly situated. [Citation omitted] 414 F.2d at 341.

Later, in *Buckley v. Littell*, 2 Cir., 1976, 539 F.2d 882, *cert. denied*, 1977, 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777, the Second Circuit relied on *Goldwater* while recognizing that,

> [i]t may be that *Gertz v. Robert Welch, Inc., supra*, 418 U.S. at 350, 94 S.Ct. 2997, 41 L.Ed.2d 789, and its underlying concern lest punitive damages be used "selectively to punish expressions of unpopular views" especially with "the wholly unpredictable amounts" that can be awarded will ultimately lead the Supreme

Court to hold that punitive damages cannot constitutionally be awarded to a public figure. But to date the Court has not so held, stating in *Gertz v. Robert Welch, Inc., supra*, only that punitive damages cannot constitutionally be awarded to a plaintiff who has met a standard of proof less demanding than "actual malice." 539 F.2d at 897.

The District of Columbia Court of Appeals, in upholding a punitive damage award in *Davis v. Schuchat*, 1975, 166 U.S. App.D.C. 351, 510 F.2d 731, said that "[w]hatever doubts may have arisen about the propriety of punitive damages from the multifarious expressions on the subject in past Supreme Court opinions, *Gertz* appears to have linked the propriety of punitive damages to the rigors of the *New York Times* definition of actual malice." 166 U.S.App.D.C. at 357, 510 F.2d at 737.

And in *Carson v. Allied News Co.*, 7 Cir., 1976, 529 F.2d 206, 214, the Seventh Circuit concluded that "[t]he fairly clear implication [of *Gertz*] is that where actual malice as defined in *New York Times* is shown, presumed and punitive damages are recoverable if the applicable state law permits such damages . . . ."

Finally, in *Appleyard v. Transamerican Press, Inc.*, 4 Cir., 1976, 539 F.2d 1026, *cert. denied*, 1977, 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753, the Fourth Circuit specifically refused to follow the district court's opinion in this case and concluded that the prevention of any chilling effect had little application where *New York Times* malice had been shown. In such a situation, "there is no good-faith attempt to point out real abuses to the public," rather "[t]here is only an unsubstantiated attack on the character, reputation and good name of a particular individual." (Footnote omitted.) 539 F.2d at 1030.

■ Overall, we find the reasoning of these opinions persuasive. It is important to safeguard First Amendment rights; it is also important to give protection to a person who is intentionally and maliciously defamed, and to discourage that kind of defa-

mation in the future.[14] A balance must be struck between those two competing interests. The language in *Gertz* suggests that punitive damages may be allowed in a case such as this where actual malice has been established. California has chosen to allow such recovery, and we find that the state's interest in deterring malicious defamation, for the purpose of protecting privacy and reputation, even when public figures are involved, is compelling.

Summa also argues that Cal.Civ.Code § 3294 is void for vagueness and overbroad, both on its face and as applied. California has not so construed it. Summa contends that the statute gives no fair warning of what penalties are likely to follow from various types of conduct and fails to provide explicit standards to guide juries. We disagree.

■ First, § 3294 is not vague or overly broad when applied in conjunction with the safeguards imposed by the *New York Times* line of cases and specifically, *Gertz*. In addition, § 3294 merely codified the earlier California common law of punitive damages which "specifically defines when exemplary damages may be awarded and how the amount shall be determined." *Bertero v. National General Corp.*, 1974, 13 Cal.3d 43, 66, n. 13, 118 Cal.Rptr. 184, 201, 529 P.2d 608, 625. Moreover, any uncertainty as to the amount of permissible punitive damages in any specific case does not invalidate the statute. Fair warning concerning the specific conduct which is prohibited has been provided by relevant case law. The fact that the amount of a proper damage award may not be precisely known before trial does not make that award unconstitutional.

■ Finally, Summa argues that § 3294 violates the First Amendment by allowing excessive damage awards. California courts, however, require a reasonable relationship between the punitive damages and actual damages awarded. *Brewer v. Second Baptist Church*, 1948, 32 Cal.2d 791, 802, 197 P.2d 713, 720; *Toole v. Richardson-Merrell, Inc.*, 1967, 251 Cal.App.2d 689, 719, 60 Cal.Rptr. 398, 419. If an excessive amount is awarded, the court may reduce it by remittitur. Sufficient safeguards against excessive punitive damages are therefore provided.

We conclude that punitive damages are permissible once actual malice as defined in *New York Times* has been established and that the statute is not overly broad or void for vagueness, and that the trial court's granting of partial summary judgment was error.[15]

In No. 75–2353, the judgment in favor of Maheu, filed and entered on December 23, 1974, insofar as it awards him damages and interest, is reversed, and the verdict on the issue of liability is reversed. The next to the last paragraph of the judgment for Summa Corporation, page 4, line 31 to page 5, line 1, also filed and entered on December 23, 1974, is affirmed. The rest of the judgment for Summa Corporation has not been appealed from and remains in effect.

In No. 75–1306, the paragraph of the judgment for Maheu which denies his claim for punitive damages, and the order appealed from, to the same effect, are reversed. The provisions of the judgment for Maheu, appearing at page 2, lines 8–12 thereof, and page 2, lines 16–18 thereof, are affirmed.

Each party will bear his or its own costs.

The case is remanded for a new trial in conformity with the views here expressed.

---

14. Shakespeare best described the interest at stake a long time ago:

> Good name in man and woman, dear my lord,
> Is the immediate jewel of their souls;
> Who steals my purse steals trash; 'tis something, nothing;
> 'Twas mine, 'tis his, and has been slave to thousands;
> But he that filches from me my good name

> Robs me of that which not enriches him,
> And makes me poor indeed.

"Othello," Act 3, Scene 3, l. 155.

15. Because we are reversing the liability judgment and damages for Maheu, a new trial with a new jury is required. Therefore Summa's challenge to the judge's order that the same jury remain impaneled to determine the punitive damage issue, if necessary, is moot.

Affirmed in part, reversed in part, and remanded.

CHOY, Circuit Judge, concurring and dissenting:

While I fully agree with my Brothers Duniway and Wallace as to the errors requiring reversal and remand of this case, I would go further and reverse and direct the district court to enter in favor of Summa a judgment notwithstanding the verdict. In this respect only do I dissent.

Two primary goals of the court—justice and judicial economy—would be advanced by that disposition. In order to avoid wasteful and unnecessary retrials and to encourage speed in litigation the Supreme Court has held that

> Rule 50(d) is permissive in the nature of its direction to the court of appeals . . , there is nothing in Rule 50(d) indicating that the court of appeals may not direct entry of judgment *n. o. v.* in appropriate cases.

*Neely v. Eby Construction Co.*, 386 U.S. 317, 324, 87 S.Ct. 1072, 1077, 18 L.Ed.2d 75 (1967). *But cf. Iacurci v. Lummus Co.*, 387 U.S. 86, 88, 83 S.Ct. 1423, 18 L.Ed.2d 581 (1967).

The test to determine the propriety of judgment n. o. v. is the same for district and appellate judges. *See Alioto v. Cowles Communications, Inc.*, 519 F.2d 777, 780 (9th Cir.), *cert. denied*, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 259 (1975). It requires the court to examine the evidence, drawing all permissible inferences and resolving all questions of credibility in favor of the party securing the jury verdict. Thereafter, the court must determine that only one interpretation of the evidence is reasonably supportable as a matter of law. *Cockrum v. Whitney*, 479 F.2d 84, 85 (9th Cir. 1973); *Juhnke v. EIG Corp.*, 444 F.2d 1323, 1325 (9th Cir. 1971). This does not permit weighing evidence as in jury deliberations, but rather determining only whether there was sufficient evidence to support the jury's verdict. *Wong v. Swier*, 267 F.2d 749, 752 (9th Cir. 1959).

Summa defended against this defamation action by claiming that Hughes' statement represented the truth: that Maheu had stolen money from the company. To escape liability for defamation under the California law applicable in this diversity action, Summa did not have to prove the literal truth of the statement. As the majority opinion acknowledges, all Summa needed to prove was that "the imputation [was] substantially true so as to justify the 'gist' or 'sting' of the remark." *Emde v. San Joaquin County Central Labor Council*, 23 Cal.2d 146, 160, 143 P.2d 20, 28 (1943); *Jeffers v. Screen Extras Guild, Inc.*, 162 Cal. App.2d 717, 728, 328 P.2d 1030, 1037 (1958), disapproved on other grounds, *MacLeod v. Tribune Publishing Co.*, 52 Cal.2d 536, 551, 343 P.2d 36, 45 (1959). No action will lie if the defense demonstrates that the defamatory statement was substantially true. *Jeffers*, 162 Cal.App.2d at 732, 328 P.2d at 1040. Slight inaccuracies of expression are immaterial when a statement is true in substance. *Restatement (Second) of Torts*, § 581A, comment f at 237 (1977).

Consequently, using the California standard for truth of a defamatory statement, this court must find that only one legitimate inference may be drawn from the evidence. Here, Hughes publicly stated that Maheu had stolen money from him, and it is clear that Summa did prove that the gist or sting of that statement was true.

While several instances of unusual financial dealings between Hughes and Maheu were explored in detail during the lengthy trial, Summa needed only to prove *one* instance in which it was substantially true that Maheu stole money from Hughes. The Tucson lease affair suffices.

Each month for nearly six years Hughes sent Maheu an exact amount of money with which he was to pay the monthly lease rent due to the Tucson Airport Authority on behalf of Hughes Tool Co. But, Maheu failed to make these payments, and when the lease was terminated the rent was nine months in arrears. Maheu had taken over $74,000 and, by his own admission, had used the money to meet personal obligations.

He explained these damaging circumstances by describing his very informal relationship with Hughes and his belief that his agreement and responsibility were only to pay the rents at some undetermined time. He professes to believe this despite the exact amount due being sent to him on a monthly basis over a long period of time. The explanation offered is too improbable to be believed by any reasonable jury. Regardless of the extraordinary manner in which Hughes conducted his business affairs, this can only reasonably be viewed as diversion or misappropriation—stealing.

Under these circumstances I would order judgment n. o. v.

Goodwin, Circuit Judge, concurred in part and dissented in part and filed opinion in which Browning and J. Blaine Anderson, Circuit Judges, joined.

Hufstedler, Circuit Judge, dissented and filed opinion in which Ely, Circuit Judge, joined.